OSCN Found Document:HUNSUCKER v. FALLIN

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 







 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 HUNSUCKER v. FALLIN
2017 OK 100
Case Number: 116131
Decided: 12/19/2017
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2017 OK 100, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

JOHN HUNSUCKER, on behalf of himself and his clients; BRUCE EDGE, on behalf of himself and his clients; CHARLES SIFERS, on behalf of himself and his clients; STEPHEN FABIAN, on behalf of himself and his clients, Petitioners,
v.
THE HONORABLE MARY FALLIN, GOVERNOR, in her official capacity; THE HONORABLE SENATOR MIKE SCHULTZ, SENATE PRESIDENT PRO TEMPORE, in his official capacity; THE HONORABLE REPRESENTATIVE CHARLES MCCALL, SPEAKER OF THE HOUSE, in his official capacity; MICHAEL THOMPSON, in his official capacity as Commissioner of Oklahoma Department of Public Safety; DAVID PRATER, in his official capacity as District Attorney for Oklahoma County; STEVE KUNZWEILER, in his official capacity as District Attorney for Tulsa County; Respondents.

APPLICATIONS TO ASSUME ORIGINAL JURISDICTION AND FOR
EXTRAORDINARY DECLARATORY AND INJUNCTIVE RELIEF

¶0 Petitioners filed an application for the Court to assume original jurisdiction and petitions to grant extraordinary declaratory and injunctive relief. Petitioners challenge the constitutionality of both Impaired Driving Elimination Act 2, (S.B. No. 643), and Governor's Executive Order 2017-19, issued on June 8, 2017, to implement the new Act or a portion thereof. The Court heard oral argument with all parties participating. The Court holds: petitioners have standing; two members of the Oklahoma Legislature possess constitutional legislative immunity from legal liability sought to be imposed by petitioners and these two respondents are dismissed as parties; Section 13 of the Impaired Driving Elimination Act 2 violates Okla. Const. Art. 2 § 7; the Impaired Driving Elimination Act 2 violates Okla. Const. Art. 5 § 57 and the temporary stay pending litigation is dissolved.

ORIGINAL JURISDICTION ASSUMED; PETITION FOR EXTRAORDINARY
DECLARATORY RELIEF GRANTED; AND PETITION FOR
EXTRAORDINARY INJUNCTION DENIED 

Brian K. Morton, Oklahoma City, Oklahoma; & Sonja R. Porter, Oklahoma City, Oklahoma, for petitioners.

M. Daniel Weitman, Assistant Attorney General, Oklahoma City, Oklahoma, for respondents Senator Mike Schultz, Oklahoma Senate President Pro Tempore, and Representative Charles McCall, Speaker of the Oklahoma House of Representatives.

Mithun Mansinghani, Solicitor General; Kevin McClure, Assistant Attorney General; Lauren E. Hammonds, Assistant Attorney General, Oklahoma City, Oklahoma, for Respondents Gov. Mary Fallin, Commissioner Michael Thompson, District Attorney David Prater, and District Attorney Steve Kunzweiler.

EDMONDSON, J.

¶1 Petitioners filed applications for the Court to assume original jurisdiction and grant extraordinary declaratory and injunctive relief. Petitioners have four constitutional claims. Two claims attack the constitutionality of Oklahoma Senate Bill No. 643, the Impaired Driving Elimination Act 2 (IDEA2). Two claims attack the constitutionality of the Governor's Executive Order 2017-19, promulgated on June 8, 2017, and designed to implement a portion of S.B. No. 643.

¶2 We hold the Impaired Driving Elimination Act 2 is unconstitutional in its entirety due to violating the single subject rule in Okla. Const. Art. 5 § 57. We hold one provision of the Act, section 13, violates the Due Process Clause in Okla. Const. Art. 2 § 7. Because we conclude the provisions of the Act are not severable and the Act is unconstitutional in its entirety, we need not adjudicate petitioners' additional claims challenging the Act and the Governor's Executive Order. We hold these petitioners possess standing. We further hold respondents Schultz and McCall are not proper parties, and their motion to be dismissed as parties is granted.

I. Petitioners' Standing

¶3 The new Impaired Driving Elimination Act 2 (IDEA2) contains seventeen numbered sections and according to its title includes, but is not limited to, provisions which relate to revocation, modification, and reinstatement of driver licenses, ignition interlock devices installed in vehicles, making certain acts unlawful, clarifying and deleting procedures relating to blood and breath tests for the presence of alcohol, surrender of driver licenses, and authorization to the Department of Public Safety to create the Impaired Driver Accountability Program by June 30, 2018. Petitioners, four Oklahoma lawyers and licensed drivers raise two constitutional claims on behalf of themselves and their clients and argue they will be adversely affected when the Act is scheduled to become effective on November 1, 2017. Respondents challenge the standing of the petitioners to bring an action challenging a new Act which has not yet been made effective.[1] Standing is a preliminary or threshold issue adjudicated prior to an examination of the merits.[2]

¶4 Petitioners allege they possess standing based upon one or more of five criteria: 1. They are subject to potential criminal prosecution pursuant to the new legislation; 2. They are subject to potential civil drivers' revocation in the future; 3. They represent the interests of future clients subject to civil and criminal proceedings within the scope of the new Act; (4) The new Act will have an adverse economic impact on their businesses which represent many Oklahomans in criminal and civil proceedings related to the subject matter of the new Act; and (5) They possess "public interest" standing. We need not analyze the issues raised by petitioners and respondents relating to petitioners' standing based upon potential criminal proceedings,[3] potential and hypothetical civil proceedings, their representation of hypothetical future clients, or any potential adverse business impact to their practice of law.[4] We find petitioners possess a public interest standing in this matter as we now explain.

 

¶5 This Court possesses discretion to grant standing to private parties to vindicate the public interest in cases presenting issues of great public importance.[5] This discretion is properly exercised to grant standing where there are "competing policy considerations" and "lively conflict between antagonistic demands."[6]

¶6 A matter that affects the rights of the citizens of the State is publici juris.[7] During oral argument before the Court all parties commented on publici juris attributes of this controversy, including the great number of Oklahoma citizens in all counties of the State subject to the provisions in the new Act related to impaired driving and other provisions;[8] and additionally certain administrative procedures authorized for Department of Public Safety creation to supplement the Act, but which have not yet been created or approved for the effective date of November 1, 2017; and other administrative procedures which the Department has legislative approval to delay creation until June 30, 2018.

 

¶7 The adjective-law[9] component to standing in an Oklahoma state court, while creating a barrier in a private-law original jurisdiction action, does not hinder this Court from giving adequate relief in a publici juris original jurisdiction proceeding.[10] Any potential Okla. Const. Art. 7 § 1 jurisdictional/"judicial power" or justiciability components to standing[11] which may act as potential barriers to petitioners' standing to obtain declaratory relief are resolved by our findings: (1) Petitioners possess interests in challenging this specific Act which are opposed to those of respondents and the controversy presents a "lively conflict between antagonistic demands;" (2) The controversy is publici juris due to the negative consequences attendant to enforcing alleged unconstitutional provisions statewide which relate to both criminal and civil adjective and substantive law involving operating a motor vehicle; (3) The controversy has an exigent nature due to the effective date for the Act which is linked to an allegation of delayed or untimely administrative regulations affecting substantive rights granted under the Act;[12] and (4) Petitioners' standing to enforce public officials' compliance with constitutional requirements by means of declaratory relief is not a prohibited advisory opinion, but has a common-law prototype "in both the historic prerogative writ of mandamus and the bill in equity for an injunction which tested the legality of public officials' conduct."[13] We conclude these petitioners possess standing to vindicate the public interest in a case presenting issues of great public importance.

II. Motion to Dismiss Filed by Respondents Schultz and McCall

¶8 Oklahoma Senate President Pro Tempore, Senator Mike Schultz, and Speaker of the Oklahoma House of Representatives, Representative Charles McCall, were named as respondents by petitioners. These two respondents filed a response and motion to dismiss the action against them. They assert they are immune from petitioner's action, and they are correct.

¶9 Petitioners allege these two respondents "in their official capacities violated the Oklahoma Constitution's single subject provision in passing SB 643."[14] In their response to the motion to dismiss, petitioners argue respondents' legislative immunity applies "only to certain criminal charges and lawsuits seeking damages." They further argue without citation of authority: "Because the legislators are the ones who passed the bill, it is only appropriate that they be made a party to the suit that seeks to have the bill voided."[15] We disagree with petitioners' interpretation of respondents' constitutionally granted legislative immunity.

¶10 The language of Oklahoma Constitution, Article 5 § 22 states: "Senators and Representatives shall, except for treason, felony, or breach of the peace, be privileged from arrest during the session of the Legislature, and in going to and returning from the same, and, for any speech or debate in either House, shall not be questioned in any other place." We have explained this language: The Speech or Debate Clause of the Oklahoma Constitution, Art. 5, § 22, absolutely protects legislators from suit calling for judicial inquiry into their performance "within the sphere of legitimate legislative activity."[16] We added:

Legislators may not be haled into court, either to account for acts that occurred in the course of legislative process or for judicial inquiry into their motivation for those acts. The legislative privilege has never been limited to words spoken in debate. The constitution's immunity shields all enactment-related conduct, whether a legislator be sued (1) personally, (2) in an official capacity, or (3) as the Legislature's leader. The line separating protected from unprotected legislative activity lies in the distinction between "purely legislative activities" and those that are nongermane "political matters".

Brock v. Thompson, 1997 OK 127, ¶ 14, 948 P.2d 287-288 (notes omitted).

¶11 Petitioners have haled into this Court these two legislators for the purpose of giving an account and defense for their participation in enacting a piece of legislation while serving in the Oklahoma Legislature. The petitioners' claim against these respondents does not fall within a listed exception in Okla. Const. Art. 5 § 22, but is based solely on petitioners' claim the legislation violates a provision of the State Constitution.

¶ 12 Senator Mike Schultz and Representative Charles McCall clearly possess immunity from the legal liability sought to be imposed by petitioners and they are dismissed as parties.

III. Okla. Const Art. 2 § 7 Due Process Clause and Senate Bill No. 643

¶13 Section 13 of the new Act amends 47 O.S. 2011 § 754, and provides upon arrest by an officer for a prohibited alcohol concentration in a breath test the evidence of driving privilege shall be seized by the officer who shall deliver it to the Department of Public Safety and the "Department shall destroy the evidence of driving privilege upon receipt thereof." The officer provides the driver with a paper receipt which serves as a driver's license for no longer than forty-five (days). No Department of Public Safety administrative hearing is allowed for challenging the seizure of the license. Petitioners argue this provision violates the Due Process Clause in our State Constitution because no opportunity for a hearing takes place (procedural due process), and "there is no need to take an individual's property and certainly no reason to destroy it" (substantive due process claim - taking of property, i.e., the driver's license).

¶14 More than forty years ago the U. S. Supreme Court explained that revocation of a driver's license must conform to the Due Process Clause.[17] The Due Process protection of the licenses was viewed not as a mere state-created interest, right, or privilege, but when drivers' licenses are issued "their continued possession may become essential in the pursuit of a livelihood . . . [and] [s]uspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment."[18] In addressing whether a license suspension hearing complied with procedural due process, the Court observed: "It is a proposition which hardly seems to need explication that a hearing which excludes consideration of an element essential to the decision whether licenses of the nature here involved shall be suspended does not meet this standard."[19]

¶15 In 1986, we explained: "One's claim to a driver's license is indeed a protectible property interest that may not be terminated without due process guaranteed by the Fourteenth Amendment."[20] The Due Process Clause in the Oklahoma Constitution, Okla. Const. Art. 2 § 7,[21] does not provide any less protection for those rights which are also protected by its federal counterpart in the 14th Amendment.[22] An Oklahoma driver's license is an interest protected by both State and Federal Due Process Clauses.

 

¶16 Respondents argue that the seizure and destruction of a driver's license upon arrest without the opportunity for an administrative hearing does not violate the State Due Process Clause because no driving privilege is revoked when the licence is seized and destroyed and an additional license may be obtained by the driver. At oral argument, counsel for the Commissioner for the Department of Public Safety stated that the new Act and new administrative rules expected to be promulgated allow a person whose license is seized and destroyed under the new Act to appear at the Department of Public Safety and replace the seized license with "a new plastic driver's license" for twenty-five dollars ($25.00), or a new temporary paper license valid for an additional forty-five days. Again, contrary to petitioners' claim that 47 O.S. § 6-303(G)[23] would prohibit a person from obtaining a new license after seizure and destruction of a license under the new Act, counsel for the Commissioner of Public Safety argued such is not the case and further argued on this basis there is no due process violation when the "piece of plastic" is seized and destroyed.

¶17 The new Act provides for revocation of driving privileges upon a person's criminal conviction of certain crimes (when final), receipt of a deferred criminal sentence, and receipt of a deferred prosecution agreement for these statutorily specified crimes.[24] Counsel for the Department of Public Safety agreed during questioning from the Court that a person arrested whose license is seized upon arrest could theoretically thereafter obtain an unrestricted number of new serial plastic driver's licenses for $25.00 each when obtained after each new and additional arrest for impaired driving (with seizure and destruction of each new serial driver's license) if the serial arrests occurred during the time his or her first criminal case was being adjudicated in the District Court. When questioned what the purpose was for seizing a license and destroying it upon arrest when no new or additional requirement would be imposed on obtaining a new license while the criminal case was being adjudicated, counsel responded that revocation of driving privileges in the new Act, with one exception, was based upon what happened in the District Court with the criminal case. He further stated that the license is not seized to commence an administrative revocation of driving privileges.[25]

¶18 The one exception to revocation of driving privileges based upon District Court criminal adjudications (conviction, deferred sentence and deferred prosecution) occurs where the Department is given discretion to revoke driving privileges in certain other circumstances. For example, when the Department receives "a report of a verified ignition interlock violation" it may revoke a driving privilege.[26] The Governor's Executive Order 2017-19 states in part:

 

I am requiring the DPS to follow directions consistent with the recent Oklahoma Supreme Court Order in Nichols v. State, ex rel. Dept. of Public Safety, 2017 OK 20. I also direct and order the DPS to grant a hearing on revocation of license in conformity with the due process clause of the Fourteenth Amendment of the United States Constitution, and within the time limits imposed by our Supreme Court. DPS may create an exception to these hearings for any individual that receives a deferred adjudication, a suspended sentence, or a formal conviction under the criminal code.

Executive Order, 2017-19, (June 8, 2017).

At oral argument, counsel for the Governor explained that Executive Order 2017-19 was intended to apply only when the Department revokes driving privileges unrelated to revocation as a direct consequence from convictions or deferred sentences prosecutions. He again explained that under the new Act revocations are either a consequence of (1) a criminal conviction (including deferred sentence/prosecution) or (2) specific statutory violations where the Department is given the power to revoke the driving privilege. He explained it is only in the latter circumstances where a driver may have an opportunity for an administrative hearing before the Department of Public Safety.

¶19 The parties agree the new Act provides for mandatory seizure of the license, its transmittal to the Department, and its immediate destruction upon receipt. The parties agree this action is not reviewable by an opportunity for any administrative proceeding. This Court determines (1) if there is a legitimate government interest (a) articulated in the legislation or (b) championed by the parties or (c) expressed by a recognized public policy in support of the legislation, and (2) if that interest is reasonably advanced by the legislation.[27] The seizure and destruction of "the piece of plastic" resulting in a circumstance where a driver must pay an additional fee to the Department for its replacement is not a nominal economic harm for the citizens of the State. The seizure takes place as part of a law enforcement procedure, but this procedure is entirely divorced from any law enforcement substantive goal, when the driver whose license is seized may obtain another identical replacement license upon payment of the standard mandatory fee.

¶20 A law enforcement seizure and immediate destruction of a driver's license constitutes an arbitrary deprivation of property when no legitimate State purpose is shown for seizure and destruction. No opportunity to challenge this seizure and destruction is given to the driver. Respondents rely upon Price v. Reed, supra, and the constitutionality of an immediate seizure of a license. However, the license seizure in Price was part of an administrative/regulatory scheme combining seizure with loss of driving privileges and with an opportunity for a driver to challenge the regulatory actions of the State. Price gives no support to respondents' due process argument on petitioners' substantive due process property claim. No State purpose, regulatory goal, or law enforcement goal for the seizure and destruction was articulated during oral argument by respondents, or is revealed in their filings, or is revealed by our review of S.B. No. 643 when construed consistent with the respondents' arguments.[28] We must conclude S.B. No. 643 amending 47 O.S. 2011 § 754 and requiring seizure and destruction of a driver's license violates the Due Process Clause of the State Constitution, Okla. Const. Art. 2 § 7.

IV. Okla. Const Art. 5 § 57 Single Subject Rule and Senate Bill No. 643

¶21 The Oklahoma Constitution, Art. 5 § 57,[29] states that every act of the Legislature, apart from specified exceptions, shall embrace but one subject. Petitioners assert S.B. No. 643 violates this constitutionally required single subject rule for legislative acts. Petitioners argue the Act includes more than one subject because it enacts law concerning: (1) revocation and modification of a driver's license for non-impaired driving offences; (2) license destruction; (3) creation of an impaired driver diversion program; (4) bond requirements; (5) criminal liability for refusing a breath test; (6) notice requirements for prosecutors in cases including those not involving impaired driving; and (7) an admission of evidence in criminal trials. This constitutional challenge requires an analysis of the provisions of the Act.

¶22 Section 1 of the Act provides the name "Impaired Driving Elimination Act 2," and is not codified. Section 2 states a purpose of Act to include "effective and meaningful administrative monitoring by the Department of Public Safety of impaired driving offenders" and is not codified. Section 3 has no reference to impaired driving, but provides for notice given by the Department to those to whom notice is authorized or required.[30] Section 4 provides a court and prosecutor shall provide notice to the Department when a person receives a deferred sentence or deferred prosecution for "any offense" which Title 47 "makes mandatory the revocation of a driving privilege.[31]

¶23 Section 5 requires revoking driving privileges when a person receives a deferred sentence, conviction, or deferred prosecution for the eleven enumerated offenses listed in the statute.[32] One of the eleven enumerated statutory offenses involves driving, operating, or being in actual physical control of a motor vehicle while under the influence of alcohol, any other intoxicating substance, or the combined influence of alcohol and any other intoxicating substance.[33] The language in S.B. No. 643, § 5, relating to deferred prosecutions and deferred sentences was not limited by the legislature to the offenses involving impaired driving relating to intoxicating substances, but placed the language in the statute so as to include other types of offenses.

 

¶24 Section 6 provides for revocations based upon conviction, deferred sentence, or deferred prosecution unless the person has successfully completed, or is currently participating in, the Impaired Driver Accountability Program."[34] This program is authorized by the new Act and which also provides the Department shall create this program by June 30, 2018. Section 6 requires the issuance of a modified driver's license and a mandatory continuous ignition interlock device. Section 6 provides for increasing time periods (one year to 4 years) for modified licenses corresponding to longer time periods for mandatory continuous ignition interlock devices based upon a driver's repeat offenses. Section 6 as amended states that the period of modification "shall be mandatory and neither the Department nor any court may grant driving privileges for the duration of that period."

¶25 Section 7 of the Act states the Department "is authorized" to make an agreement with a person whose license is revoked or suspended "for issuance of a provisional license that allows a person to drive between statutorily specific places.[35] Section 7 also includes a requirement the Department shall establish the Impaired Driver Accountability Program by June 30, 2018, approximately eight months after the Act's effective date of November 1, 2017.[36] This section provides for driver participation fees for the program and length of required participation by the driver. A driver must request participation in the program within fifteen calendar days of his or her license being seized.[37]

¶26 Section 8 of the Act includes provisions relating to ignition interlock devices and restricting driving privileges based upon receipt of a report of a "verified ignition interlock violation as defined by the Board of Tests for Alcohol and Drug Influence."[38] This section provides for issuance of a "restricted driver license" and fees to be paid to the Department, and the fees collected shall be remitted to the State Treasury for use by the Department of Public Safety for administering this section of law.

¶27 Section 9 forbids a person to "knowingly authorize or permit" another person to operate a motor vehicle without an ignition interlock device, when the person is required to use such a device; and a violation of this section is defined as a misdemeanor punishable by fine or imprisonment.[39] The section also prohibits a person interfering with the operation of the ignition interlock device or driving a vehicle without the device. The ignition interlock device is made a mandatory condition of any bond, unless the person has successfully completed the Impaired Driver Accountability Program prior to a plea or verdict in the person's criminal case.

¶28 Section 10 provides that breath shall be tested unless the officer requests a blood test.[40] Section 11 provides that blood may drawn by an "Intermediate Emergency Medical Technician," and additionally "Advanced Emergency Medical Technicians or Paramedics" when requested by a law enforcement officer.[41] Section 12 states it shall be a misdemeanor for a conscious person to refuse to submit to a breath test when under arrest for driving while impaired, driving under the influence or while under the influence being in actual physical control of a motor vehicle upon public roads, or other public place, or any private road which provides access to one or more dwellings.[42] Section 13 provides for seizure and destruction of a driver's license upon arrest of an individual.[43] Section 14 states that a person whose license revocation is modified "may only operate a motor vehicle equipped with an approved ignition interlock device.[44]

¶29 Section 15 contains provisions for admission of test results in any criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a motor vehicle while under the influence of alcohol."[45] The section specifies "the following may be considered as evidence that the test of the breath of the person was validly administered in accordance with the rules of the Board of tests for Alcohol and Drug Influence" and then lists four criteria. Section 15 states a person's refusal to a test or tests is admissible, and further provides that in some circumstances the results of " the test of a [sic] the breath or blood of the person, if admissible, shall be admitted without reference to measurement uncertainty."

 

¶30 Section 16 of the Act repeals 47 O.S.2011 § 755, and section 17 makes November 1, 2017, the effective date of the Act.

¶31 Legislation with multiple sections or provisions must be germane, relative, and cognate to a common theme and purpose.[46] Compliance with this test allows those voting on the law in question to avoid making an otherwise constitutionally prohibited forced decision to accept an all or nothing choice between two or more unrelated provisions contained in one measure.[47] The public is entitled to a clear picture of how their elected officials have voted on a particular issue,[48] the public is entitled to be adequately notified of the potential effect of legislation,[49] and these constitutionally protected public policies have been recognized since statehood.[50] Respondents argue the Act is necessary as "a common purpose" for Department of Public Safety administrative enforcement of statutes prohibiting impaired driving, and further "administrative monitoring" is a stated purpose in the Act. Respondents also invoke the highly generalized subject of "impaired driving."

¶32 Section 13's license seizure and destruction upon arrest does not advance an articulated goal related to administrative monitoring of an impaired driving. New criminal liability for a breath test refusal is created by section 12, and while this subject relates generally to "impaired driving" its function within the legislatively stated purpose of the Act, "administrative monitoring by the Department of Public Safety" is not present on the face of the Act. Section 11's expanded scope in authorizing additional medical personnel to draw blood for a test upon request by an officer is related to "impaired drivers" in a general sense. However, the individual legislator's calculus in deciding whether to vote for or against such language involves the legislator's discretion concerning the professional expertise of the classes of individuals named for the statutory task and not the Department's administrative monitoring of impaired drivers. Sections 13, 12, and 11 violate the single subject rule in Okla. Const. Art. 5 § 57 when measured against the other provisions of the Act.

¶33 Section 15's creation of an evidentiary standard for admission of breath tests states it applies to "a proceeding arising out of of acts alleged to have been committed by a person . . . under the influence of alcohol," and this is sufficiently broad to include DPS administrative enforcement of the impaired driving statutes and administratively monitoring impaired drivers. However, the language is expressly made applicable to "the trial of any criminal action," a forum outside the purview of the Department of Public Safety's "administrative monitoring" of impaired driving. Section 15's reach into District Court criminal proceedings is beyond administrative monitoring and violates the single subject rule in Okla. Const. Art. 5 § 57 when measured against the other provisions of the Act.

¶34 Section 4 of the Act clearly provides for notices to the Department when a person receives a deferred sentence or deferred prosecution for offenses other than those related to impaired driving. Section 4's reach to include non-impaired offenses is beyond the stated purpose of administrative monitoring for impaired drivers and violates the single subject rule in Okla. Const. Art. 5 § 57 when measured against the other provisions of the Act. Section 4's invalidity impacts both sections 5 and 6. Section 5 requires revocation upon receipt of a notice of a deferred sentence or a deferred prosecution. This provision appears to involve "administrative monitoring by the Department of Public Safety," but enforcement is based upon notices required by section 4, and section 4 violates the single subject rule. Similarly, section 6 also relies upon these section 4 notices of deferred sentences and prosecution agreements.

¶35 Again, requiring notice of deferred sentences and prosecutions for crimes other than impaired driving clearly goes beyond the scope of an Act seeking to administratively monitor impaired driving offenders. The Act does not contain a severability clause, but 75 O.S.2011 § 11a[51] requires a severability analysis. We are required to ask whether §§ 5 & 6 (assuming they also do not violate Art. 5 § 57) are capable of statewide equal enforcement in the absence of the statutory mandatory procedure in § 4 for providing the notices of deferred sentences or deferred prosecutions upon which sections 5 and 6 expressly rely.[52] Fundamental fairness cannot be afforded except within a framework of orderly procedure, and an orderly procedure is required when procedure is used to deprive a person of a constitutionally protected right, such as a driver's license with its driving privileges.[53] We hold §§ 5 and 6 are not severable, and must fall with section 4.

¶36 Generally, a severability analysis requires us to ask whether constitutional sections of an Act are capable of being executed in accordance with legislative intent.[54] Stripping those sections from the Act which we have now determined are constitutionally invalid, §§ 4, 5, 6, 11, 12, 13, and 15, upon examination of the remaining sections we must conclude they are not capable of being executed independently. These sections, although containing legislative subjects therein not germane to the invalid sections, they nevertheless contain internal references to, and rely upon, the invalid sections of S.B. No. 643, and they contain various provisions for repealing current procedures which would turn a selective enforcement of these sections[55] into an unpalatable legislative choice by a legislator when faced with approving an all-or-nothing choice on these sections.[56] We decline to give our opinion an effect which would have created an impermissible choice when originally presented to the legislators.

¶37 We conclude S.B. No. 643 violates Okla. Const. Art. 5 § 57 and Section 13 of S.B. No. 643 also violates Okla. Const. Art. 2 § 7. Because of these conclusions we need not address petitioners' additional claims that S. B. No. 643 impermissibly (1) revokes and modifies a driver's license for non-impaired driving offences, or (2) creates an impaired driver diversion program, or (3) creates invalid bond requirements. The parties agree the Governor's Executive Order 2017-19, was issued to administratively implement the new Act or a portion thereof. Due to our holding S.B. No. 643 violates Okla. Const. Art. 5 § 57 in its entirety, and leaving nothing for the Executive Order to enforce, we need not reach petitioners' additional claims characterizing the Executive Order as a pocket veto,[57] or challenging the order based upon the separation of powers provision in Okla. Const. Art. 4 § 1.[58] We presume public officials perform their public duties in good faith and we withhold equitable mandatory relief in anticipation of this performance.[59] Petitioners' request for injunctive relief is denied.

V. Conclusion and Effective Date of Court's Opinion

¶38 The Court concludes the petitioners have standing. Two members of the Oklahoma Legislature possess constitutional legislative immunity from the legal liability and their motion to dismiss them as parties is granted. Section 13 of the Impaired Driving Elimination Act 2 violates Okla. Const. Art. 2 § 7. Several provisions of the Impaired Driving Elimination Act 2 violate Okla. Const. Art. 5 § 57 and non-offending sections are not capable of being severed for independent enforcement. We conclude the Impaired Driving Elimination Act 2 is unconstitutional in its entirety, and we need not adjudicate petitioners' remaining claims challenging either the Act or the Governor's Executive Order. Petitioners' request for an injunction is denied.

¶39 The Court previously issued an order staying the application of the 2017 Impaired Driving Elimination Act 2, (S.B. No. 643). Hunsucker v. Fallin, ___ P.3d ___, 2017 OK 84 (October 30, 2017). The Court noted its stay was for the purpose of granting temporary relief in order to protect the rights of parties pending resolution of a judicial controversy.[60] This Court's opinion is an exercise of original jurisdiction, the opinion is immediately effective upon its filing with the Clerk of this Court, and no post-opinion mandate issues by this Court.[61] The stay pending this litigation is dissolved upon the conclusion of the matter before this Court. The stay shall be dissolved upon denial of a petition for rehearing if rehearing is sought by any party and not granted, or upon final adjudication of any petition for rehearing granted by the Court, or upon expiration of the time to file a petition for rehearing if no rehearing is sought. The temporary stay of the Act pending litigation will be effectively replaced by a final opinion of this Court concluding the Act is unconstitutional and lacking legal enforceability.

¶40 COMBS, C.J.; WATT, EDMONDSON, COLBERT, and REIF, JJ., concur.

¶41 GURICH, V.C.J.; KAUGER, and WYRICK (by separate writing), JJ., concur in part and dissent in part.

¶42 WINCHESTER, J., (by separate writing), dissent.

FOOTNOTES

[1] Respondents rely in part on Kowalski v. Tesmer, 543 U.S. 125, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) where the Court concluded the attorneys did not have standing in an Art. III federal court to assert the rights of third parties who were hypothetical future clients.

[2] State ex rel. Howard v. Oklahoma Corporation Commission, 1980 OK 96, 614 P.2d 45, 47.

[3] We also do not reach issues necessarily raised by petitioners' claim which relate to this Court's jurisdiction to determine the proper application of a criminal statute to a party before this Court, including, but not limited to, the propriety of a declaratory and injunctive relief request to a court in a civil action to enjoin or prevent a criminal action.

[4] In some circumstances, economic loss occasioned by governmental regulation has been sufficient to show Article III standing in a federal court. Nova Health Systems v. Gandy, 416 F.3d 1149, 1155 (10th Cir. 2005) citing Salem Inn, Inc. v. Frank, 522 F.2d 1045, 1047 n. 10 (2d Cir.1975); Montana Shooting Sports Ass'n v. Holder, 727 F.3d 975, 979 (9th Cir. 2013); National Credit Union Admin. v. First Nat. Bank & Trust Co., 522 U.S. 479, 495-498, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998). We need not analyze circumstances when government regulation involving economic loss shows standing in an Article III federal court, or how such relates or compares to a petitioner's standing in an Oklahoma state court.

[5] Gentges v. Oklahoma State Election Board, 2014 OK 8, ¶ 7, 319 P.3d 674, 676, quoting State ex rel. Howard v. Oklahoma Corporation Commission, 1980 OK 96, 614 P.2d 45, 51.

[6] Gentges, 2014 OK 8, ¶ 7, 319 P.3d at 676, quoting State ex rel. Howard, 614 P.2d at 52.

[7] State ex rel. Freeling v. Lyon, 1917 OK 229, 165 P. 419, 420.

[8] The response filed by Governor Fallin, et al., states that in 2015 over 13,000 requests were made by drivers for Department of Public Safety administrative hearings. Response (July 21, 2017) at p. 2.

[9] The concept of "adjective law" includes legal rules or procedure or practice as opposed to substantive law. Black's Law Dictionary 62 (4th ed. 1951); Maurizi v. Western Coal & Mining Co., 321 Mo. 378, 11 S.W.2d 268, 272 (1928) ("All of the authorities hold that a 'substantive law is that part of the law which creates, defines and regulates rights as opposed to adjective or remedial law, which prescribes the method of enforcing rights or obtaining redress for their invasion.'").

[10] Ethics Commission v. Cullison, 1993 OK 37, 850 P.2d 1069, 1073.

[11] Tulsa Industrial Authority v. City of Tulsa, 2011 OK 57, ¶ 13, 270 P.3d 113, 120-121, discussing Gordon v. Followell, 1964 OK 74, 391 P.2d 242, 243--244, and the concept that declaratory relief is limited to cases of actual controversy, and such is a jurisdictional component in the context of declaratory relief.

[12] Dank v. Benson, 2000 OK 40, ¶ 6, 5 P.3d 1088, 1090-1091 ("only under the most exigent circumstances are we to intercede in the internal affairs of a coordinate branch of government when it exercises a function--i.e., legislative or executive--committed to it by the Constitution"). See also Ethics Commission v. Keating, 1998 OK 36, ¶ 3, 958 P.2d 1250, 1253 ("Frequently, when this Court has assumed original jurisdiction in a publici juris controversy we have done so because of a public need for a speedy judicial determination.").

[13] State ex rel. Oklahoma Bar Ass'n v. Mothershed, 2011 OK 84, n. 135, 264 P.3d 1197, citing Jaffe, Standing to Secure Judicial Review: Public Actions, 74 Harv. L.Rev. 1265, 1269, 1273--1274 (1961).

[14] Petitioners' Application to Assume Original Jurisdiction and Petition for Declaratory and Injunctive Relief, Okla. Sup. Ct. No. 116,113 (June 21, 2017) at p. 2.

[15] Petitioners' Reply to Respondents' Response, etc., Okla. Sup. Ct. No. 116,131 (August 11, 2017) at p. 11.

[16] Brock v. Thompson, 1997 OK 127, ¶ 14, 948 P.2d 279, 287 (notes omitted).

[17] Bell v. Burson, 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). See also Logan v. Zimmerman Brush Co., 455 U.S. 422, 430-31, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (a "property" interest may be "intangible" and relate "to the whole domain of social and economic fact;" and the Court listed Bell and a driver's license as an additional example).

The United States Const., Amend. 14, provides in pertinent part:

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws...."

[18] Bell, 402 U.S. at 539.

[19] Bell, 402 U.S. at 542.

[20] Price v. Reed, 1986 OK 43, 725 P.2d 1254, 1260 (notes omitted).

[21] Okla. Const. Art. 2, § 7 provides that: "No person shall be deprived of life, liberty, or property, without due process of law."

[22] State ex rel. Bd of Regents of University of Oklahoma v. Lucas, 2013 OK 14, n. 25, 297 P.3d 378, 391 ("Oklahoma's Due Process Clause, Okla. Const. Art. 2, § 7, is coextensive with its federal counterpart, although there may be situations in which the Oklahoma provision affords greater due process protections than its federal counterpart."), citing Oklahoma Corrections Professional Ass'n, Inc. v. Jackson, 2012 OK 53, n. 13, 280 P.3d 959, 963.

[23] 47 O.S.Supp.2016 § 6-303 (G):

G. It shall be a misdemeanor punishable by imprisonment for not less than seven (7) days nor more than six (6) months, or by a fine of not more than Five Hundred Dollars ($500.00), or by both such fine and imprisonment, for any person to apply for a renewal or a replacement license to operate a motor vehicle while the person's license, permit or other evidence of driving privilege is in the custody of a law enforcement officer or the Department. A notice regarding this offense and the penalty therefor shall be included on the same form containing the notice of revocation issued by the officer.

[24] S. B. No. 643, § 5, amending 47 O.S. 2011 § 6-205, as amended by Section 1, Chapter 279, O.S.L. 2013 (47 O.S.Supp. 2016, § 6-205), states:

A. The Department of Public Safety shall revoke the driving privilege of any person, whether adult or juvenile, who, in any municipal, state or federal court within the United States, receives a deferred sentence, or a conviction, when such conviction has become final, or a deferred prosecution, for any of the following offenses:

1. Manslaughter or negligent homicide resulting form the operation of a motor vehicle;

2. Driving, operating or being in actual physical control of a motor vehicle while under the influence of alcohol, any other intoxicating substance, or the combined influence of alcohol and any other intoxicating substance, or any offense in subsection A of Section 11-902 of this title;

3. Any felony during the commission of which a motor vehicle is used;

4. Failure to stop and render aid as required under the laws of this state in the event of a motor vehicle accident resulting in the death or personal injury of another;

5. Perjury or the making of a false affidavit or statement under oath to the Department under the Uniform Vehicle Code or under any other law relating to the ownership or operation of motor vehicles;

6. A misdemeanor or felony conviction for unlawfully possessing, distributing, dispensing, manufacturing, trafficking, cultivating, selling, transferring, attempting or conspiring to possess, distribute, dispense, manufacture, traffic, sell, or transfer of a controlled dangerous substance as defined in the Uniform Controlled Dangerous Substances Act while using a motor vehicle;

7. Failure to pay for gasoline pumped into a vehicle pursuant to Section 1740 of Title 21 of the Oklahoma Statutes;

8. A misdemeanor conviction for a violation of Section 1465 of Title 21 of the Oklahoma Statutes;

9. A misdemeanor conviction for a violation of Section 609 of Title 37 of the Oklahoma Statutes;

10. Failure to obey a traffic control device as provided in Section 11-202 or 11-703 of this title when such failure results in great bodily injury to any other person; or

11. Failure to stop or to remain stopped for school bus loading or unloading of children pursuant to Section 11-705 or 11-705.1 of this title.

B. The first license revocation under any provision of this section, except for paragraph 2, 6, 7 or 11 of subsection A of this section, shall be for a period of one (1) year. Such period shall not be modified.

C. A license revocation under any provision of this section, except for paragraph 2, 6, or 7 of subsection A of this section, shall be for a period of three (3) years if a prior revocation under this section, except under paragraph 2 of subsection A of this section, commenced within the preceding five-year period as shown by the records of the Department. Such period shall not be modified.

D. The period of license revocation under paragraph 2 or 6 of subsection A of this section shall be governed by the provisions of Section 6-205.1 of this title.

E. The first license revocation under paragraph 7 of subsection A of this section shall be for a period of six (6) months. A second or subsequent license revocation under paragraph 7 of subsection A of this section shall be for a period of one (1) year. Such periods shall not be modified.

F. The first license revocation under paragraph 11 of subsection A of this section shall be for a period of one (1) year. Such period may not be modified. Any appeal of the revocation of driving privilege under paragraph 11 of subsection A of this section shall be governed by Section 6-211 of this title.

G. As used in this section, "great bodily injury" means bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ.

[25] Historically, a driver's license seizure was part of a civil regulatory/administrative proceeding. Price v. Reed, 1986 OK 43, 725 P.2d 1254, 1258-1259.

[26] S.B. No. 643, § 8 (B), amending 47 O.S.2011 § 6-212.3, as amended by Section 2, Ch. 393, O.S.L. 2013 (47 O. S. Supp.2016, § 6-212.3): "The Department of Public Safety may revoke, suspend or restrict the driving privileges of the person upon receipt of a report of a verified ignition interlock violation as defined by the Board of Tests for Alcohol and Drug Influence."

[27] Torres v. Seaboard Foods, L.L.C., 2016 OK 20, ¶ 28, 373 P.3d 1057, 1072.

[28] The receipt/temporary license given by the arresting officer appears to be used by the Act as a triggering event for a driver's fifteen calendar days to request participation in the Impaired Driver Accountability Program to be created by June 30, 2018. See S.B. No. 643, § 7 (F)(1) ("The Department may enter into an IDAP program agreement with a person if: (1) The Department receives the request for IDAP participation pursuant to this section within fifteen (15) calendar days from the date reflected on the dated receipt issued by the officer to the person pursuant to subsection B of Section 754 of this title, on the form provided by the Department...."). No argument was made concerning why a notice to a driver used for commencing time for requesting participation in the program requires seizure and destruction of that person's license.

[29] Okla. Const. Art. 5 § 57:

Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title, except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of statutes; and no law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only; but so much thereof as is revived, amended, extended, or conferred shall be re-enacted and published at length: Provided, That if any subject be embraced in any act contrary to the provisions of this section, such act shall be void only as to so much of the laws as may not be expressed in the title thereof.

[30] S. B. No. 643, § 3, amends 47 O.S.2011 § 2-116.

[31] S. B. No. 643, § 4, amends 47 O.S.2011 § 6-204.

[32] S. B. No. 643, § 5, amends 47 O.S.2011 § 6-205, as amended by section 1, Ch. 279, O.S.L. 2013 (47 O.S.Supp. 2016 § 6-205).

[33] S. B. No. 643, § 5, amending 47 O.S.Supp.2016 § 6-205 (A)(2).

[34] S. B. No. 643, § 6, amends 47 O.S.2011 § 6-205.1, as amended by section 1, Ch. 393, O.S.L. 2013 (47 O.S.Supp. 2016 § 6-205.1).

[35] S. B. No. 643, § 7, amends 47 O.S.2011 § 6-212, as amended by section 3, Ch. 97, O.S.L. 2015 (47 O.S.Supp. 2016 § 6-212).

[36] Due to our holdings herein we need not reach the issue raised during oral argument concerning a statutory right created under the new Act effective November 1, 2017 to not have a license revoked based upon a driver's participation in an administrative program which may not be created until several months after creation of the statutory right.

[37] See note 28, supra.

[38] S. B. No. 643, § 8, amends 47 O.S.2011 § 6-212.3, as amended by section 2, Ch. 393, O.S.L. 2013 (47 O.S.Supp. 2016 § 6-212.3).

[39] S. B. No. 643, § 9, amends 47 O.S.2011 § 11-902a.

[40] S. B. No. 643, § 10, amends 47 O.S.2011 § 751.

[41] S. B. No. 643, § 11, amends 47 O.S.2011 § 752.

[42] S. B. No. 643, § 12, amends 47 O.S.2011 § 753, as amended by section 1, Ch. 131, O.S.L. 2015 (47 O.S.Supp. 2016 § 753).

[43] S. B. No. 643, § 13, amends 47 O.S.2011 § 754.

[44] S. B. No. 643, § 14, amends 47 O.S.2011 § 754.1, as amended by section 4, Ch. 393, O.S.L. 2013 (47 O.S.Supp. 2016 § 754.1).

[45] S. B. No. 643, § 15, amends 47 O.S.2011 § 756.

[46] Fent v. Fallin, 2013 OK 107, ¶ 5, 315 P.3d 1023, 1025; Burns v. Cline, 2016 OK 121, ¶ 27, 387 P.3d 348; Douglas v. Cox Retirement Properties, Inc., 2013 OK 37, ¶ 6, 302 P.3d 789, 792.

[47] Fent v. Fallin, 2013 OK 107, ¶ 5, 315 P.3d 1023, 1025.

[48] Fent v. Fallin, 2013 OK 107, ¶ 5, 315 P.3d 1023, 1025.

[49] Douglas v. Cox Retirement Properties, Inc., 2013 OK 37, ¶ 4, 302 P.3d 789, 792.

[50] Fent v. State ex rel. Oklahoma Capitol Improvement Authority, 2009 OK 15, ¶ 15, 214 P.3d 799, 804-805, citing In re County Commissioners of Counties Comprising Seventh Judicial Dist., 1908 OK 207, 98 P. 557.

[51] 75 O.S.2011 § 11a:

In the construction of the statutes of this state, the following rules shall be observed:

1. For any act enacted on or after July 1, 1989, unless there is a provision in the act that the act or any portion thereof or the application of the act shall not be severable, the provisions of every act or application of the act shall be severable. If any provision or application of the act is found to be unconstitutional and void, the remaining provisions or applications of the act shall remain valid, unless the court finds:

a. the valid provisions or application of the act are so essentially and inseparably connected with, and so dependent upon, the void provisions that the court cannot presume the Legislature would have enacted the remaining valid provisions without the void one; or

b. the remaining valid provisions or applications of the act, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

2. For acts enacted prior to July 1, 1989, whether or not such acts were enacted with an express provision for severability, it is the intent of the Oklahoma Legislature that the act or any portion of the act or application of the act shall be severable unless:

a. the construction of the provisions or application of the act would be inconsistent with the manifest intent of the Legislature;

b. the court finds the valid provisions of the act are so essentially and inseparably connected with and so dependent upon the void provisions that the court cannot presume the Legislature would have enacted the remaining valid provisions without the void one; or

c. the court finds the remaining valid provisions standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

[52] Thomas v. Henry, 2011 OK 53, ¶ 31, 260 P.3d 1251, 1261-1262.

[53] Arkansas Valley State Bank v. Phillips, 2007 OK 78, ¶ 10, 171 P.3d 899, 903 ("The due process clauses of the United States and the Oklahoma Constitutions provide that certain substantive rights--life, liberty and property--cannot be deprived except by constitutionally adequate procedures.") (notes omitted); Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 179, 71 S.Ct. 624, 652, 95 L.Ed. 817 (1951) (Douglas, J., concurring) ("It is procedure that spells much of the difference between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law.").

[54] Thomas v. Henry, 2011 OK 53, at ¶ 31, 260 P.3d at 1261-1262.

[55] See, e.g., S.B. No. 843 § 14, referencing modification under S. B. No. 643, § 6, amending 47 O.S.Supp. 2016 § 6-205.1.

[56] Fent v. Fallin, 2013 OK 107, ¶ 7, 315 P.3d 1023, 1025 (The single subject rule prohibits this unpalatable choice thust upon a legislator to approve or disapprove a bill with multiple subject.).

[57] A bill does not become law when a Governor creates an impermissible pocket veto of a substantive (non-appropriations) bill by giving a partial or qualified approval of the bill. Johnson v. Walters, 1991 OK 107, 819 P.2d 694, 699, quoting State ex rel. Wiseman v. Oklahoma Board of Corrections, 1978 OK 158, 614 P.2d 551, 555.

[58] Okla. Const. Art. 4 § 1:

The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in this Constitution, the Legislative, Executive, and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others.

[59] In re Initiative Petition No. 397, State Question No. 767, 2014 OK 23, n. 20, 326 P.3d 496, 504.

[60] The Court possesses judicial discretion to grant temporary relief or relief on the merits, with an opinion to follow, in order to protect the rights of parties pending resolution of a judicial controversy when a short period of time occurs between oral argument and the time an event will occur concerning the merits of the controversy. In re Initiative Petition No. 314, 1980 OK 174, 625 P.2d 595, 596; Southwestern Bell Telephone Co. v. Oklahoma Corporation Commission, 1994 OK 142, 897 P.2d 1116, 1118-1119.

[61] In re Guardianship of Berry, 2014 OK 56, n. 1, 335 P.3d 779, 783, citing Okla. Sup. Ct. R. 1.16, 1.193; Chronic Pain Associates, Inc. v. Bubenik, 1994 OK 127, 885 P.2d 1358, 1364 ("In all original proceedings, other than those to review a decision of the Workers' Compensation Court or to impose bar discipline, the decision of this Court shall become effective when the opinion or order is filed with the Clerk of this Court, unless this Court stays the effective date."); Okla. Sup. Ct. R. 1.16 (no mandate is issued upon conclusion of an original jurisdiction action).

 

 

WINCHESTER, J, with whom GURICH, V.C.J. joins, dissenting:

¶1 I dissent to the majority opinion which prematurely strikes down the Legislature's attempt to restructure the State's impaired driving laws, 47 O.S.2011 §517 et seq. I do not find that the plaintiffs in this case, attorneys who claim their business interests will be affected by the enactment of the proposed laws, have the requisite standing to bring suit.

¶2 Today's majority opinion strays far from our traditional standing authority, stretching the publici juris standing doctrine well beyond the intent of the rule's exception. As a result, the majority opinion will allow back-door lawsuits brought by attorneys to challenge any legislation that might potentially impact their bottom dollar, all under the guise of a public interest controversy. The majority fails to recognize that the plaintiffs in this case have no directly traceable interest to the rights alleged to be violated by the proposed statutes. Indeed, the plaintiffs' own, admitted personal interest in the case is a hypothetical, monetary loss reliant on the retention of future, potential clients who illegally drive while impaired in this State. In my opinion, this is insufficient to constitute the necessary, directly traceable interest to confer standing.

BACKGROUND

¶3 The State's current impaired driving laws have created an administrative nightmare for the Department of Public Safety (DPS), which is extremely costly and inefficient for the State, but beneficial to attorneys hired by clients arrested for impaired driving to represent them in license revocation hearings before DPS. The Legislature, with the proposition of S.B. 643, created a new Act, the Impaired Driving Accountability Program (IDAP), to remedy the backlog of administrative hearings by eliminating automatic license privilege revocations.

¶4 S.B. 643 eliminates the administrative backlog by removing the need for driver's license revocation hearings and foregoing automatic suspension of the driver's license, instead deferring the decision on revocation until the driver's criminal case is resolved or the driver under arrest enters an agreement with DPS for the placement of an ignition interlock device. Under such an agreement, the driver is allowed to continue to drive with an unrevoked license, in the form of a temporary receipt, so long as the interlock device is installed in their car. If the driver successfully completes the interlock device program, full, unrestricted driving privileges will be restored, no license revocation will appear on the driver's record, and the driver will not be charged a license reinstatement fee. If the driver refuses to enter the IDAP agreement, the temporary license will remain in effect until the driver's criminal case is resolved. Also new under the proposed statutes, a driver will face a misdemeanor charge if he or she refuses to take State's blood or breath test.

DISCUSSION

¶5 Standing refers to a party's legal right to seek relief in a judicial forum. Fent v. Contingency Review Bd., 2007 OK 27, ¶ 7, 163 P.3d 512, 519. The burden is on the party invoking a court's jurisdiction to establish that it has the requisite standing to seek relief in the court. Oklahoma Education Ass'n v. State ex rel. Oklahoma Legislature, 2007 OK 30, ¶ 7, 158 P.3d 1058, 1062. I believe the plaintiffs in this case have failed to meet their burden.

¶6 The U.S. Supreme Court has defined the question of standing as whether "a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." Sierra Club v. Morton, 405 U.S. 727, 731-732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). See also, Cities Serv. Co. v. Gulf Oil Corp., 1999 OK 16, ¶ 5, 976 P.2d 545, 547 (To have standing, the party must be "proper party to seek adjudication of the asserted issue."). The general, threshold criteria of standing include: (1) a legally protected interest which must have been injured in fact i.e., suffered an injury which is actual, concrete and not conjectural in nature, (2) a causal nexus between the injury and the complained-of conduct, and (3) a likelihood, as opposed to mere speculation, that the injury is capable of being redressed by a favorable court decision. Fent v. Contingency Review Bd., 2007 OK 27, ¶ 7, 163 P.3d 512, 519. The doctrine of standing ensures a party has a personal stake in the outcome of a case and the parties are truly adverse. Id. Moreover, the injury in fact must be "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

¶7 As a general rule, a litigant lacks standing to assert the rights of others. See United States Dep't of Labor v. Triplett, 494 U.S. 715, 720, 110 S.Ct. 1428, 1431, 108 L.Ed.2d 701 (1990) (plurality opinion). See also Barrows v. Jackson, 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed.2d 1586 (1953) (Ordinarily, one may not claim standing to vindicate the constitutional rights of a third party); Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (A plaintiff must assert his own legal rights and interests and may not rest his claim to relief on the legal rights or interests of third parties.). Judicial review should not "be placed in the hands of 'concerned bystanders' to use it simply as a 'vehicle for the vindication of value interests.'" Diamond v. Charles, 476 U.S. 54, 62, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986)(quoting United States v. SCRAP, 412 U.S. 669, 687, 935 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973)).

¶8 The U.S. Supreme Court does not look favorably on third party standing and has imposed a more stringent exam when standing is sought in such cases. Kowalski v. Tesmer, 543 U.S. 125, 125-126, 125 S.Ct. 564, 565, 160 L.Ed.2d 519 (2004). Two additional showings must be made: (1) "whether the party asserting the right has a 'close' relationship with the person who possesses the right" and (2) "whether there is a 'hindrance' to the possessor's ability to protect his own interests." . Kowalski, 543 U.S. at 130, 125 S.Ct. at 567, citing Powers v. Ohio, 499 U.S. 400, 411, 111 S.Ct. 1364, 1370-1371, 113 L.Ed.2d 411 (1991).

¶9 In Kowalski v. Tesmer, 543 U.S. 125, 125-126, 125 S.Ct. 564, 565, 160 L.Ed.2d 519 (2004), the Court held that attorneys lacked third party standing to bring suit on behalf of future, hypothetical clients. Recognizing no existing relationship between the attorneys and the alleged, future clients, the Court found the requisite "close relationship" lacking. Kowalski, 543 U.S. at 131, 125 S.Ct. at 568. Likewise, the Court disregarded the attorney's arguments that the alleged clients were actually hindered from asserting their own rights. Kowalski, 543 U.S. at 132, 125 S.Ct. at 569. The Kowalski Court recognized that "it would be a short step from the ... grant of third-party standing in this case to a holding that lawyers generally have third-party standing to bring in court the claims of future unascertained clients." Kowalski, 543 U.S. at 134, 125 S.Ct. at 570.

¶10 A similar hypothetical injury was deemed insufficient by the Court in Diamond v. Charles, 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). There, the Court refused to confer third party standing on a pediatrician who alleged possible future, pecuniary harm from higher rates of abortions. In that case, Illinois had opted not to defend one of its statutes that interfered with the right to abortion. Diamond, a pediatrician, had been allowed to intervene in the case below to defend the constitutionality of the Illinois provision. His interest in the case rested on his assertion that if the laws were struck down, abortion would increase resulting in fewer births, which would ultimately cause his client base to shrink. The Diamond Court found that such a speculative claim of "injury in fact," based upon numerous future contingencies, was insufficient to allow third-party standing. Diamond, 476 U.S. at 66.

¶11 Our own Court has recognized that standing must be predicated on cognizable, economic harm when a legislative act is challenged as unconstitutional or invalid. Osage Nation v. Board of Commissioners of Osage County, 2017 OK 34, ¶ 61, 394 P.3d 1224, 1244. To invalidate a statute as unconstitutional, a party must establish standing by showing that the legislation sought to be invalidated detrimentally affects his/her interest in a direct, immediate and substantial manner. Id.

¶12 Typically, our publici juris standing cases have involved situations such as where taxpayers were challenging government expenditures, which is not the case herein. We have, however, recognized judicial discretion in select cases, not involving government expenditures, to grant standing to private parties to vindicate the public interest in cases presenting issues of great public importance. See Gentges v. Okla. State Election Bd., 2014 OK 8, 319 P.3d 674; State ex rel. Howard v. Oklahoma Corporation Commission, 1980 OK 96, 614 P.2d 45. Nevertheless, we have held that this limited discretion is only properly exercised to grant standing where the party challenging the legality of the government action is the actual object of the action at issue. Oklahoma Public Employees Association v. Oklahoma Department of Central Services, 2002 OK 71, ¶ 16, 55 P.3d 1072, 1079 (emphasis added). In such cases, "there is ordinarily little question that the action ... has caused ... injury, and that a judgment preventing or requiring the action will redress it." Id.

¶13 Here, the plaintiffs are unable to claim that they are the object of the challenged action and any judgment regarding the statute's constitutionality would only potentially affect them indirectly. The admitted and overriding reason for the involvement herein of the plaintiffs is their alleged potential, pecuniary loss at the abolition of administrative hearings for driver's license revocations. This claimed injury is as speculative and hypothetical as the injury alleged in both Kowalski and Diamond and should not serve as any basis upon which to confer standing.

¶14 The majority emphasizes that granting standing to plaintiff attorneys in this case would benefit the community as a whole. I find it difficult to see how an attorney making an alleged profit on potential, future criminal defendants is a benefit for the public interest or community as a whole. Not only is there a complete absence of evidence to show that the plaintiffs would in fact earn less income as a result of the proposed statutes, the plaintiffs cannot even point to a named client who has been or is threatened by the proposed statutes. Significantly, there is no reason why an alleged future client could not assert his or her own claim. This fact alone should be sufficient to deny standing to plaintiffs.

¶15 Even if we are to assume standing in this case as the majority urges with its convoluted reasoning, the plaintiffs cannot escape the requirement of an actual, justiciable controversy. In actions seeking declaratory relief, the existence of a justiciable controversy is paramount. In Knight ex rel. Ellis v. Miller, 2008 OK 81, 195 P.3d 372, this Court set forth the requirements for standing under the Oklahoma Declaratory Judgment Act:

The requisite precedent facts or conditions which the courts generally hold must exist in order that declaratory relief may be obtained may be summarized as follows: (1) there must exist a justiciable controversy; that is to say, a controversy in which a claim of right is asserted against one who has an interest in contesting it; (2) the controversy must be between persons whose interests are adverse; (3) the party seeking declaratory relief must have a legal interest in the controversy, that is to say, a legally protect[a]ble interest; and (4) the issue involved in the controversy must be ripe for judicial determination. (emphasis added).

Id. at ¶ 8, 195 P.3d at 375 (quoting Gordon v. Followell, 1964 OK 74, ¶ 8, 391 P.2d 242, 244.

¶16 If courts were to decide hypothetical controversies, it would take the judiciary beyond the bounds of authorized judicial action and offend the basic principles of the separation of powers. See Dank v. Benson, 2000 OK 40, 5 P.3d 1088 (Opala, J., concurring at ¶ 6)("The barriers of justiciability prevent judges from roving outside the judicial role and giving voice to abstract grievances.") Providing a judgment based on a set of hypothetical facts is no different than issuing a disfavored, advisory opinion. See Knight ex rel. Ellis v. Miller, 2008 OK 81, ¶ 8, 195 P.3d 372, 375 ("This Court does not issue advisory opinions or answer hypothetical questions where there is no case or controversy, and this rule does not change when a declaratory judgment is involved."); Richardson v. State ex res. Okla. Tax Comm., 2017 OK 85, ¶ 5, __ P.3d __ ("The Supreme Court will not decide abstract or hypothetical questions.").

CONCLUSION

¶17 This case is a classic example of placing the cart before the horse. Here, the plaintiffs, as third parties to the claimed constitutional violations of the proposed S.B. 643, have suffered no actual, present injury and it is unknown how, if at all, their income would be affected by the implementation of the proposed statutes. Enlarging public interest standing to allow attorneys to challenge a proposed law's possible application to a potential, future client flies in the face of U. S. Supreme Court case law, as well as our own, requiring strict adherence to the justiciability of a case.

¶18 The relaxation of standing requirements such as is promoted by the majority opinion will result in a standardless evaluation of standing. Future standing queries will be left to a subjective, case by case assessment by a court regarding the claims it deems sufficiently significant to merit review. Standing jurisprudence has long provided a fundamental limitation on government authority that cannot be disregarded based on discretion. I respectfully dissent.

 

 

Wyrick, J., with whom Gurich, V.C.J., and Winchester, J., join, concurring in part and dissenting in part:

¶1 Our Constitution grants the Court the power to decide justiciable cases--i.e., live controversies where there is a plaintiff with standing and an issue that is ripe for review. This limitation is a crucial component of the separation of powers between the co-equal branches of our government. It is what keeps our non-political branch out of the business of resolving policy disputes.

¶2 Because the litigants who bring it lack standing under our well-accepted three-part test (no member of the Court argues otherwise), this matter does not meet the constitutional standard for justiciability. The Court nonetheless invokes a boundless "public importance" exception to our normal standing rules so that it may assume jurisdiction and declare SB 643 unconstitutional. In so doing, the Court disregards constitutional limits on its jurisdiction and does damage to the separation of powers between the co-equal branches of government. I respectfully dissent, except to that part of the judgment correctly dismissing the claims against the legislative Respondents.

I.

A.

¶3 The Court "grants" standing to the DUI attorneys who challenge SB 643 based on what it calls its "discretion to grant standing to private parties to vindicate the public interest in cases presenting issues of great public importance."[1] We have no such discretion. Rather, we have repeatedly said that the "irreducible constitutional minimum of standing"[2] requires that a litigant establish (1) a concrete and particularized injury-in-fact that is not conjectural or hypothetical in nature, (2) that is fairly traceable to the complained of actions, and (3) which will be redressed by a favorable decision.[3] We also require "the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant."[4] In other words, the injury must be personal to the party suing, rather than a generalized grievance suffered by the public at large[5]--a key limitation that seemingly forecloses the possibility of any standing based on a generalized "public interest." The DUI attorneys who bring this case do not come close to meeting this standard.

¶4 First, the attorneys claim that the new law might harm them in the future if they decide to drive drunk, if they happen to be arrested for doing so, and if they are then charged with driving under the influence. This is precisely the sort of remote, hypothetical, "future eventuality" that we have repeatedly said does not give rise to an injury in fact.[6]

¶5 Second, they claim that the new law might harm unidentified members of the public who also might choose to drive drunk, who might be arrested for drunk driving, and who then might choose to retain the Petitioners as counsel. This claim not only suffers from the same imminence problem as their first claim, but also has the additional fatal defect of being an attempt to vindicate vicariously an injury to a third party.[7]

¶6 Third, the attorneys claim that the new law might cause them a decrease in business, presumably by reducing the number of administrative hearings they might have the opportunity to litigate. But we have never recognized standing in an attorney on the basis that a change in the law might reduce their business. This is so because an attorney has no "legally protected interest" in the law remaining static for the benefit of the attorney's practice.[8] Moreover, these attorneys' claim of lost business is still both hypothetical and remote, given that it will be many months before the rules and regulations defining the scope and nature of future administrative proceedings are implemented. Thus, even if these attorneys had a protectable interest in the law, because we don't yet know its true impact, any claim that it will produce fewer billable hours for these attorneys is too speculative to support standing.[9]

¶7 To this point, we quite recently reaffirmed our adherence to the rule that "[t]o be appropriate for judicial inquiry, a controversy must be . . . definite [and] concrete."[10] In Richardson v. State ex rel. Oklahoma Tax Commission, we rejected as not ripe a challenge to HB 2348 because the effect of the law was "unclear at this time," due to the fact that the relevant impact of the law would not be known until action was taken by a federal administrative agency (the IRS) to promulgate rules setting the federal standard deduction amount.[11] Just as was the case there, the actual effects of SB 643 will not be known until state administrative agencies promulgate rules defining the processes that will be utilized to implement the new law. Given all this, our judicial process would be better served by waiting for an actual case to arise where an actual person is charged with DUI and is actually subjected to the new procedures, so that we can examine the legality of the law as it actually is, rather than as we speculate it may be.

B.

¶8 The Court doesn't bother to analyze these claims, and understandably so; they fail our standing test by every measure. The Court instead focuses solely on the DUI attorneys' claim that they possess "public interest" standing. Pointing to comments made at oral argument about "the great number of Oklahoma citizens in all counties of the State subject to the . . . new Act," and "the negative consequences attendant to enforcing alleged unconstitutional provisions," the Court concludes that the matter is publici juris. [12] And in the Court's view, that means it has "discretion to grant standing to private parties to vindicate the public interest in cases presenting issues of great public importance," discretion that is "properly exercised . . . where there are 'competing policy considerations' and 'lively conflict between antagonistic demands.'"[13]

¶9 Let that sink in. The Court believes it can reduce to nil "the irreducible constitutional minimum" of standing anytime it is presented with two parties disagreeing over important policy considerations. In other words, the Court can disregard constitutional limits on its jurisdiction anytime it is presented with precisely the type of policy dispute that those constitutional limits are designed to bar it from deciding. But nothing in our Constitution permits us to assume jurisdiction over a case merely because the issue it presents is "important," and the Court's invocation of the publici juris standard as a measure of justiciability is without precedent.

¶10 The Court cites two cases in support of its claim of unfettered "discretion to grant standing to private parties to vindicate the public interest in cases presenting issues of great public importance."[14] But neither case justifies today's remarkable expansion of the Court's jurisdiction. In Gentges v. Oklahoma State Election Board, the Court found that an individual voter had standing to challenge a new state law requiring that she present a valid driver's license at her polling place prior to voting.[15] Because she was "no doubt" a member of the class that was the object of the challenged legislation, the voter had standing to sue, even if her injury was shared by other voters.[16] To be sure, the Court also recognized that Gentges's vindication of her right to vote necessarily worked to vindicate the rights of all others in the class of voters affected by the law, but that wasn't to say that Gentges would have standing even if she wasn't a member of the class regulated by the law.[17] It was merely a recognition of the broad reach of the voter-identification law, and the far-reaching impact of a judgment in Gentges's favor.

¶11 State ex rel. Howard v. Oklahoma Corporation Commission, meanwhile, presented a highly unusual fact pattern that dictated its sui generis result.[18] The Legislature enacted a measure imposing certain obligations on the Corporation Commission. The Attorney General--a former Corporation Commissioner who had opposed the measure in that capacity--opined that the measure violated Article V, Section 57, due to an allegedly deficient title. The Attorney General's opinion was advisory only, but the Commission nonetheless declined to follow the new law. In response, members of the Legislature brought an original action seeking a writ that would force the Commission to comply with the new law. Staff attorneys for the Commission entered appearances as counsel for the Commission, but the Attorney General did the same, arguing that only he could legally represent the Commission. The Attorney General also argued that the members of the Legislature lacked standing and that he was the sole party entitled to vindicate the State's interest in execution of the law--an interest he intended to vindicate by dismissing the legislators' lawsuit so as to thwart judicial review of the issue upon which he had opined.

¶12 The Court first rejected the Attorney General's claim that the legislators lacked standing, finding that the legislators possessed "an interest in vindicating the State Legislature's exercise of its power, sought to be nullified by the Attorney General's opinion in question."[19] With regard to whether the Attorney General was the sole party entitled to pursue the State's interest, the Court concluded that "[g]enerally the Attorney General as chief law officer of the State, would be the proper party to maintain litigation to enforce a matter of public interest."[20] But given the highly unusual circumstance where "the Attorney General[,] in pursuing a minority view he had previously asserted as a member of the Commission, now under the cloak of authority of chief law officer of the state, asserts the right to negative an act of the legislative branch," the Court allowed "a private citizen in the name of the State" to "vindicate a public right."[21] Weighing these "competing policy considerations" over who could bring the case, the Court ultimately allowed the legislators to sue, the Commission to be represented by its own counsel, and the Attorney General to appear ex officio such that the case would proceed "as a three-cornered proceeding" with "lively conflict between antagonistic demands."[22]

¶13 Nothing in State ex rel. Howard stands for the proposition that the mere presence of important "competing policy considerations" allows the Court to grant standing to those who otherwise lack it. Indeed, the Court found that the suing legislators possessed standing to vindicate their interests as legislators in having the State's laws enforced. The only question was whether state law required that the Attorney General pursue that interest on their behalf. The "competing policy considerations" the Court described were the policy concerns relating to who ought to bring such a suit--the legislators or the Attorney General--and not the competing policy considerations raised by the underlying merits question. The result the Court reached, meanwhile, ensured that the matter wouldn't evade judicial review--a concern not present in this case.

¶14 These cases do not compel today's decision, nor is today's outcome a logical extension of those cases; today's decision is an outright abandonment of any pretense that the Constitution limits the Court's jurisdiction in any meaningful way. The Court treats our "irreducible" jurisdictional rules as mere technical requirements that sometimes hamper its ability to be the final arbiter of the thorniest issues facing our State. But when we say that a plaintiff must have standing in order to bring suit, we aren't describing a limitation for limitation's sake; we're talking about a key structural feature of our Constitution designed to maintain the separation of powers between the co-equal branches of government. Our Constitution requires that "the Legislative, Executive, and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others,"[23] and Article VII, Section 4's grant of jurisdiction to this Court to hear "cases" is key to this design. By limiting our jurisdiction to justiciable "cases," the Constitution ensures that the judicial branch stays confined to its role of exercising judicial judgment rather than political will.

¶15 Our Constitution empowers us to be judicial, but with that power comes the obligation to be judicious.[24] Because decisions like today's are unreviewable, we meet that obligation only by adhering to objective legal standards that demonstrate the ability to constrain judicial discretion. The "public interest" standing test the Court invokes fails this test. When is a case "important" enough to trigger this form of standing? When we tell you it is, of course. That isn't a power-confining legal standard, but rather a constitution-trumping card to be invoked at the will of five.

II.

¶16 The Court's decision on the merits is no less problematic. The Court invokes Article V, Section 57's single-subject rule as a basis for invalidating all of SB 643. This shouldn't come as a surprise; our increasingly permissive standing rules and amorphous single-subject (and special-law) jurisprudence have created a potent one-two punch that allows the Court to judicially veto virtually any of the Legislature's and People's laws so long as someone files the proper papers in the clerk's office to initiate suit--this despite the fact that the single-subject rule was never intended "to be so exactingly enforced and in such technical manner as to cripple legislation."[25] But even as flawed as our single-subject jurisprudence is, this law passes the test; there is nothing to suggest that any legislator lacked notice of the effects of SB 643 or that the measure passed only because unpopular provisions were logrolled with popular provisions.[26]

¶17 In concluding otherwise, the Court first errs by misidentifying SB 643's subject. The Court points to a portion of the Act's stated purpose ("administrative monitoring by the Department of Public Safety") as the reference point for its single-subject analysis.[27] But an act's purpose (what it is designed to accomplish) is not the same as its subject matter (the area or realm in which it operates). Article V, Section 57 requires that an act's subject be contained in its title,[28] and SB 643's title describes the Act as "[a]n Act relating to impaired driving"[29]--a subject confirmed by reading the Act to ascertain the answer to the question: "What is this bill about?" Thus, for our purposes, the subject of SB 643 is "impaired driving," and our analysis should turn on whether the Act's contents fairly relate to that subject (they do). The Court's identification of a more narrow subject, and subsequent insistence that most of the Act does not relate to it, demonstrates the result-driven approach that our single-subject jurisprudence invites. That the bulk of the Act doesn't relate to the Court's narrowly crafted subject isn't proof that the Act violates the single-subject rule; it is evidence that the Court misidentified the actual subject of the Act. It should go without saying that the identification of the subject of a legislative act should be driven not only by its title or stated purpose, but also by its contents.

¶18 The Court begins with section 13 of the Act, which authorizes license seizure and destruction when a person is arrested for impaired driving or where a person arrested on suspicion of impaired driving refuses to take a breath or blood test.[30] This section is related to the subject of impaired driving, and as the linchpin section of the Act, no one can seriously argue that the Legislature was forced to compromise the integrity of its "impaired driving" bill by adding it. Accordingly, the Court says nothing about section 13's subject or its potential for logrolling. Its only explanation for striking section 13 as a single-subject violation is that "[s]ection 13's license seizure and destruction upon arrest does not advance an articulated goal related to administrative monitoring of an [sic] impaired driving."[31] But whether section 13 is effective in advancing the Legislature's goal is irrelevant in a single-subject analysis; the relevant question is whether the provision relates to the subject of the Act. Because it plainly does, the inquiry is complete. And even if the Court is correct in identifying the subject as administrative monitoring of those arrested for drunk driving, this section relates to that subject too, as an arrest for impaired driving is a necessary predicate to any subsequent administrative monitoring, and seizure of the plastic license is an administrative consequence of such an arrest.

¶19 The same is true for section 12, which makes it a misdemeanor to refuse to take a breath test upon suspicion of impaired driving.[32] The Court acknowledges that the section relates to the subject of impaired driving, but argues that "while this subject relates generally to 'impaired driving' its function within the legislatively stated purpose of the Act, 'administrative monitoring by the Department of Public Safety' is not present on the face of the Act."[33] Again, how the provision functions or how well it furthers a stated purpose is immaterial. If section 12 relates to the Act's subject of impaired driving--and it does--the single-subject inquiry is complete. And just as before, even if the Court is correct in identifying the subject as administrative monitoring of those arrested for drunk driving, this section relates to that subject too, as an arrest is a necessary predicate to any subsequent administrative monitoring, and a breath test is an important component of an impaired-driving arrest.

¶20 Section 11, meanwhile, expands the class of persons eligible to perform blood tests on suspected impaired drivers to include EMT's and paramedics.[34] No one disputes that a law regulating who can perform blood tests on those suspected of impaired driving relates to the subject of impaired driving.[35] Despite that uniformity of subject, the Court nonetheless concludes that this section violates the single-subject rule because "the individual legislator's calculus in deciding whether to vote for or against such language involves the legislator's discretion concerning the professional expertise of the classes of individuals named for the statutory task and not the Department's administrative monitoring of impaired drivers."[36] But whether a legislator may have to consider broader policy implications in deciding whether to make an amendment to a particular section of law has nothing to do with whether the law survives single-subject scrutiny; all that matters is whether the amendment fairly relates to the same subject as its sister provisions. According to the Court's logic, the Legislature would be constitutionally prohibited from enacting any comprehensive regulatory scheme,[37] as doing so inevitably involves legislative consideration of cross-cutting policy concerns. And the same would be true for any law that lists classes to which it applies,[38] as any additions or deletions to the list inevitably involves weighing the relative characteristics of the classes and their appropriateness for inclusion. The single-subject rule requires uniformity of subject, not singularity of legislative policy concern. And again, even if the Court is correct in its identification of the subject, any provision relating to an arrest that is a necessary predicate to any subsequent administrative monitoring is necessarily related to that administrative monitoring, and blood tests are certainly integral to that scheme.

¶21 Section 15 establishes certain procedures for introducing the results of an alcohol-concentration test as evidence in proceedings pertaining to impaired driving.[39] This section pertains to the subject of impaired driving. Subpart A of the law begins

Upon the trial of any criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a motor vehicle while under the influence of alcohol or any other intoxicating substance . . . evidence of the alcohol concentration in the blood or breath of the person as shown by analysis of the blood or breath of the person performed in accordance with [applicable law] . . . is admissible.[40]

Again, even assuming the Court is correct in defining the subject of the Act more narrowly as the "administrative monitoring of impaired driving," the Court admits that section 15 "is sufficiently broad to include DPS administrative enforcement of the impaired driving statutes and administratively monitoring impaired drivers."[41] That should end the inquiry, but somehow it doesn't. The Court concludes that section 15 nonetheless violates the single-subject rule because the evidentiary rules it creates apply in all impaired-driving proceedings, both criminal and administrative. With no citation of authority or meaningful analysis, the Court simply says that "[s]ection 15's reach into District Court criminal proceedings is beyond administrative monitoring and violates the single subject rule."[42]

¶22 This conclusion is unsupportable. Section 15--like the rest of this bill--is amendatory; it amends 47 O.S. § 756, which already applies to both criminal and administrative proceedings related to impaired driving. Indeed, the above-quoted portion of subpart A exists as part of 47 O.S. § 756 and was unchanged by the Act. SB 643 merely adds subpart D, which lists things that may be offered as proof that a breath test was "validly administered"; subpart E, which prohibits reference to measurement uncertainty when admitting breath or blood tests; and subpart F, which requires the district attorney to share documents pertaining to the maintenance of the breath-test instruments and makes the persons responsible for such logs available to testify. Nothing added by SB 643 expands the reach of 47 O.S. § 756 into proceedings it didn't already reach. In fact, only subpart D even references the scope of the law, and merely parrots the language used in the pre-existing subpart A: "Upon the trial of any criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a motor vehicle while under the influence of alcohol . . . ."[43] Thus, the rules for admitting evidence of impaired driving were already codified in a single section and applied to both criminal and administrative proceedings.[44] Under the Court's logic, the prior version of 47 O.S. § 756 must also be unconstitutional because it too was enacted in a single bill, and thus the result of invalidating the new version of the statute would be to reanimate a prior version presumably suffering from the same constitutional infirmity.[45] While the Court may prefer that the Legislature enact separate laws establishing the rules for admission of breath- and blood-test results into evidence in criminal and administrative proceedings--even where the rules are to be identical--nothing in the Constitution compels the Legislature to operate in such an inefficient manner.

¶23 The Court employs similar logic to invalidate section 4, which requires DPS to now receive notice of not just convictions, but also deferred sentences and deferred prosecution agreements "for any offense for which this title makes mandatory the revocation of the driving privilege."[46] According to the Court, section 4 violates the single-subject rule because the offenses for which title 47 requires revocation (and thus for which section 4 requires notice) include more than just impaired-driving offenses.[47] As an initial matter, title 47 requires revocation for impaired-driving offenses[48] and accordingly section 4 relates to the subject of impaired driving. Moreover, like with section 15, section 4 merely amends a statute that already contained the laundry list of traffic offenses to which it applied. Thus, prior to the amendment, 47 O.S. § 6-204 required DPS to receive notice of all convictions for which title 47 required revocation,[49] and § 6-205 already included those non-impaired-driving offenses.[50] SB 643 merely adds that notice also be given of deferred sentences and deferred prosecution agreements. So again, it appears that to satisfy this Court's single-subject rules, rather than merely add deferred sentences and deferred prosecution agreements to the existing notice provision, the Legislature would have to enact one law that requires notice of deferred sentences and deferred prosecution agreements for impaired-driving offenses, and then enact another law doing exactly the same thing for non-impaired-driving offenses. Nothing in Article V, Section 57 compels such legislative inefficiency.

¶24 The Court concludes its single-subject analysis with sections 5 and 6 of the Act, which respectively define the offenses for which driving privileges are revoked and prescribe the lengths of those revocations.[51] Section 5, which amends 47 O.S. § 6-205, includes impaired driving as a revocation-triggering offense, and section 6, which amends 47 O.S. § 6-205.1, sets the lengths of time a person's driving privileges are revoked for impaired-driving offenses. Sections 5 and 6 thus relate to the subject of impaired driving. But rather than strike down sections 5 and 6 for relating to some other subject, the Court strikes sections 5 and 6 because they relate to section 4--specifically, because they depend on section 4's notice requirements in order to be effective. The Court does not--and cannot--explain how sections 5 and 6 create disuniformity of subject. Indeed, this is the first time of which I am aware that the Court has ever held that being too related to another section of the bill amounts to a violation of the single-subject rule.

¶25 SB 643 doesn't violate the single-subject rule; its title adequately describes its effect, and the entirety of the bill relates to impaired driving. There is nothing to suggest that this overwhelmingly popular piece of legislation[52] passed only because our legislators were bamboozled as to its contents or were forced to vote for it despite their objection to unpopular provisions unrelated to impaired driving. That the Court nonetheless manages to invoke Article V, Section 57 as a basis for invalidating this duly enacted law demonstrates just how broken our single-subject jurisprudence has become. We say that the single-subject rule isn't "to be so exactingly enforced and in such technical manner as to cripple legislation,"[53] yet today we quibble over whether provisions all plainly related to the common subject of impaired-driver regulation are closely related enough to satisfy an entirely subjective standard. This isn't what the rule was meant to be. It is high time we take a critical look at our single-subject jurisprudence and ask ourselves whether we are providing the Legislature with adequate notice of what the law requires, whether we are applying the single-subject rule in line with the text and original understanding of Article V, Section 57, and whether we are providing the public with confidence that our invalidations of democratically enacted statutes are the predictable product of even-handed application of a neutral rule. In my view, we are not.

III.

¶26 Despite having deemed the law unconstitutional in its entirety for violating the single-subject rule,[54] the Court volunteers that section 13 of the Act also violates the DUI attorneys' "substantive" due process rights because the hypothetical seizure of their license card advances no legitimate "State purpose, regulatory goal, or law enforcement goal."[55] This conclusion will likely come as a surprise to the parties because this matter has at all times proceeded as a procedural due process challenge to SB 643--i.e., a claim that section 13 of the Act did not provide adequate notice and opportunity to be heard prior to the seizure of the license.[56] The phrase "substantive due process" makes its first appearance in this case not in the parties' briefs or oral arguments, but in the Court's opinion, where it is abruptly unveiled as a basis for striking down the law.[57] There is much wrong with this, both as a matter of process and as a matter of substance.

¶27 First, because the claim wasn't raised in the Application, wasn't briefed, and wasn't supported by a single citation to substantive due process authority, we would normally refrain from deciding the case on that basis--fair process demands as much.[58] This is particularly true where the Court bases its substantive due process conclusion on the fact that "no State purpose, regulatory goal, or law enforcement goal for the seizure and destruction was articulated during oral arguments by Respondents, or is revealed in their filings."[59] If due process means anything, it means not penalizing a party for failing to anticipate that the Court will decide a case on grounds the parties never briefed.

¶28 Second, it is "[t]he party seeking a statute's invalidation as unconstitutional [that] has the burden to show the statute is clearly, palpably, and plainly inconsistent with the Constitution."[60] And there is a "strong presumption" in favor of the validity of legislative enactments,[61] a presumption that is particularly strong when a law is alleged to be facially invalid because such a challenge is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."[62] Because of these presumptions, the Court cannot insist that the State supply it with a legitimate basis for its law when the DUI attorneys have not met their initial burden of demonstrating that no such legitimate basis is conceivable.[63] The burden, after all, isn't on the State to prove the law is constitutional, but rather on the DUI attorneys to prove it is not.

¶29 Third, substantive due process is typically invoked to protect unenumerated "fundamental" rights,[64] but no one argues that SB 643 implicates any such right. Even on the exceedingly rare occasion where substantive due process has been invoked to invalidate laws without specifically identifying a fundamental right, a legally protected life, liberty, or property interest of some sort must be implicated.[65] The DUI attorneys have no such protected right in their plastic drivers' license card because the law explicitly says so: "No person shall have a property interest in the physical driver license issued pursuant to the laws of this state."[66] In concluding otherwise the Court merely cites a case where we held that persons have a protected property interest in their driving privileges.[67] It is possible that the Court is implicitly holding that the driving privilege and the plastic license card are inextricably intertwined such that deprivation of one always works a deprivation of the other. But all parties agree that isn't so because SB 643 allows arrestees to retain their driving privileges after their plastic license card is seized.[68] And given the Court's ultimate conclusion that section 13 is irrational because it allows arrestees to lose their plastic card but not their driving privileges, it seems that even the Court ultimately thinks that the two things are distinct (it can't have it both ways). Additionally, the Court upheld a previous version of the statute that also allowed seizure of the plastic license upon arrest, finding that the previous version raised no due process concerns.[69] Given the constitutionality of this long-existing statutory scheme, the Court's sudden reversal of course is not only puzzling, but it results in a return to the prior scheme that also allows for seizure of the plastic license without notice and an opportunity to be heard. If there is in fact a protected property interest in the plastic license, a due process challenge to that preexisting law will surely follow.

¶30 Lastly, even if the DUI attorneys had a protected interest in their plastic license card, it is possible to conceive of legitimate reasons why the Legislature would allow for its seizure without also suspending the privilege to drive. For example, the Legislature might have concluded that the prior statutory scheme, which caused automatic suspension of driving privileges unless the arrestee requested an administrative hearing, was too costly in light of this Court's recent decision requiring that those administrative hearings occur at a faster pace.[70] Given the State's dire financial situation, the Legislature may well have concluded that satisfying the Court's directive would be too costly, and thus determined that the financial costs of administrative suspension of driving privileges were simply more than it could bear. The Legislature would also have a legitimate reason to retain the requirement that the plastic card be seized if it rationally determined that the inconvenience of loss of that plastic card (a plastic card that people use daily to verify purchases, to access airports, etc.) might serve as a deterrent to even a single drunk-driving incident. Or perhaps, given the goal of increasing enrollment in the IDAP program and the proven success of interlock-device programs in other states, the Legislature may have concluded that eliminating immediate loss of privileges with protracted administrative review would encourage arrestees to opt into the IDAP program to soften the criminal consequences of their impaired driving. Recall, we have said that our obligation is to uphold a law under rational basis review if we can conceive of any rational basis for the law.[71] The Court makes no attempt to do so here, opting instead to stop at the State's failure to offer such a basis in response to a claim that was never made.

¶31 As best I can tell, the United States Supreme Court has in 227 years invalidated only a single law applying rational basis review to a substantive due process claim[72]--appropriately so, given that "[r]ational-basis scrutiny is a highly deferential standard that proscribes only that which clearly lies beyond the outer limit of a legislature's power."[73] This Court, however, has now done so twice in two years,[74] this time to tell the Legislature that it "clearly lies beyond the outer limits" of its power to enact a law allowing law enforcement to seize licenses from drunk drivers--licenses that exist only under the condition that "[n]o person shall have a property interest" in them. The rub of today's decision is that no matter how much process is provided prior to the seizure, the Legislature is now constitutionally forbidden from authorizing law enforcement to take the licenses of drunk drivers unless it comes up with a better reason for doing so. And who gets to decide whether the reason is good enough? Who else but the Court. We may well insist that "it is not the place of this Court, or any court, to concern itself with a statute's propriety, desirability, wisdom, or its practicality,"[75] but the version of substantive due process review that we unveil today is a proxy for doing just that.

* * *

¶32 For these reasons, the application to assume original jurisdiction should be denied. I respectfully dissent to all of the judgment except that part dismissing the legislative Respondents.

FOOTNOTES

[1] Majority Op. ¶ 5.

[2] E.g., Toxic Waste Impact Grp., Inc. v. Leavitt, 1994 OK 148, ¶ 8, 890 P.2d 906, 910 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). That we have repeatedly said that federal standing jurisprudence guides our state law standing jurisprudence should come as no surprise; the language of the state and federal Constitutions closely parallel one another, with Oklahoma's grant of jurisdiction to this Court modeled on Article III's grant of jurisdiction to the federal courts. See U.S. Const. art. III, § 2, cl. 1 ("The judicial power shall extend to all Cases, in Law and Equity[.]"); Okla. Const. art. VII, § 4 ("The appellate jurisdiction of the Supreme Court shall be co-extensive with the State and shall extend to all cases at law and in equity[.]").

[3] Toxic Waste Impact Grp., 1994 OK 148, ¶ 8, 890 P.2d at 910-11 (quoting Lujan, 504 U.S. at 560-61).

[4] Hendrick v. Walters, 1993 OK 162, ¶ 5 n.14, 865 P.2d 1232, 1236 n.14 (emphasis added) (quoting Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982)).

[5] Warth v. Seldin, 422 U.S. 490, 499 (1975) ("[W]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction.").

[6] See Toxic Waste Impact Grp., 1994 OK 148, ¶ 9, 890 P.2d at 911.

[7] See Barzellone v. Presley, 2005 OK 86, ¶ 18 n.32, 126 P.3d 588, 594 n.32 ("[The] Court does not address a party's asserting vicariously the constitutional rights of others."(citing Forest Oil Corp. v. Corp. Comm'n of Okla., 1990 OK 58, ¶ 31, 807 P.2d 774, 788)); see also Kowalski v. Tesmer, 543 U.S. 125, 131 (2004) (denying standing to vindicate rights of hypothetical clients).

[8] Toxic Waste Impact Grp., 1994 OK 148, ¶ 9, 890 P.2d at 911. The majority cites a handful of federal cases that it says stand for the proposition that "economic loss occasioned by governmental regulation has been sufficient to show Article III standing in a federal court." Majority Op. ¶ 4 & n.4. But each of the cases cited merely stands for the non-controversial proposition that when a business is the target of a new regulation that causes it economic harm, the business has suffered an injury-in-fact. None of the cases stand for the proposition that a business not actually regulated by the new law--and these DUI attorneys' law practices are in no way the target of these regulations--has standing merely because the regulation might have an attenuated negative effect on their revenues.

[9] To that point, this Court has in the past said that "[s]peculation as to which of many paths the law in a given area will take in the future is a transparent veil behind which people act out their own policy preferences," and that "'[g]uesses about the future development of any rule of law have never been an acceptable rule of decision in Anglo American jurisprudence." In re Initiative Petition No. 349, State Question No. 642, 1992 OK 122, ¶ 13, 838 P.2d 1, 7 (internal quotation marks omitted) (relying on those statements as a basis for preventing the people of this State from voting on a measure that would have placed in our Constitution a provision preempted under current federal law). The Court today engages in just that sort of speculation so that it may preemptively invalidate a law duly enacted by the People's representatives.

[10] Richardson v. State ex rel. Okla. Tax Comm'n, 2017 OK 85, ¶ 5, --- P.3d ----.

[11] Id.

[12] Majority Op. ¶¶ 6-7.

[13] Id. ¶ 5 (quoting Gentges v. Okla. State Election Bd., 2014 OK 8, ¶ 7, 319 P.3d 674, 676; State ex rel. Howard v. Okla. Corp. Comm'n, 1980 OK 96, ¶¶ 37-38, 614 P.2d 45, 52).

[14] Id. ¶ 5 & n.5 (citing Gentges, 2014 OK 8, ¶ 7, 319 P.3d at 676; State ex rel. Howard, 1980 OK 96, ¶¶ 29, 31, 614 P.2d at 51).

[15] 2014 OK 8, ¶¶ 9, 12, 319 P.3d at 677.

[16] Id. ¶¶ 10-12, 319 P.3d at 677.

[17] For example, no one would seriously argue that Gentges would have possessed standing had she been a resident of Texas or not otherwise been registered to vote in Oklahoma.

[18] 1980 OK 96, 614 P.2d 45.

[19] Id. ¶ 34, 614 P.2d at 52.

[20] Id. ¶ 35, 614 P.2d at 52.

[21] Id.

[22] Id. ¶¶ 37-38, 614 P.2d at 52.

[23] Okla. Const. art. IV, § 1.

[24] The Federalist No. 51, at 319 (James Madison) (Clinton Rossiter ed., Signet Classic 2003) (1788) ("If men were angels, no government would be necessary. . . . In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself.").

[25] Brooks v. State, 1931 OK 580, ¶ 17, 3 P.2d 814, 816.

[26] Douglas v. Cox Ret. Props., Inc., 2013 OK 37, ¶ 4, 302 P.3d 789, 792 ("The purposes of the single-subject rule are to ensure the legislators or voters of Oklahoma are adequately notified of the potential effect of the legislation and to prevent logrolling." (citing Nova Health Sys. v. Edmondson, 2010 OK 21, 233 P.3d 380)).

[27] E.g., Majority Op. ¶ 32 (quoting Impaired Driving Elimination Act 2 [hereinafter IDEA2], ch. 392, § 2, 2017 O.S.L. 1560, 1561-62).

[28] Okla. Const. art. V, § 57 ("Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title . . . .").

[29] IDEA2, 2017 O.S.L. at 1560-61.

[30] Id. § 13, 2017 O.S.L. at 1576-78 (to be codified at 47 O.S. § 754).

[31] Majority Op. ¶ 32.

[32] IDEA2, sec. 12, § 753(B), 2017 O.S.L. at 1576 (to be codified at 47 O.S. § 753).

[33] Majority Op. ¶ 32.

[34] IDEA2, sec. 11, § 752(A), 2017 O.S.L. at 1573 (to be codified at 47 O.S. § 752).

[35] Majority Op. ¶ 32; OA at 26:29 (counsel for Petitioners, in response to a question about how the section relates to the subject of impaired driving, conceded that it "actually would be related to impaired driving in that when there's an accident, if they believe somebody is driving under the influence, it just provides for an EMT to be one of the designated people to draw blood in that instance").

[36] Majority Op. ¶ 32.

[37] But see Bond v. Phelps, 1948 OK 76, ¶ 35, 191 P.2d 938, 947 ("The constitutional prohibition of more than one subject in an act does not impose any limitation on the comprehensiveness of the subject, which may be as comprehensive as the Legislature chooses to make it, provided it constitutes, in the constitutional sense, a single subject and not several. To constitute plurality of subject, an act must embrace two or more dissimilar and discordant subjects, that by no fair intendment can be considered as having any legitimate connection with or relation to each other. Within the meaning of the constitutional provision, matters which apparently constitute distinct and separate subjects are not so where they are not incongruous and diverse to each other. Generally speaking, the courts are agreed that a statute may include every matter germane, referable, auxiliary, incidental, or subsidiary to, and not inconsistent with, or foreign to, the general subject or object of the act." (quoting 50 Am. Jur. Matters Germane to the General Subject or Object §197, at 178 (1941)).

[38] See, e.g., 5 O.S.2011 § 1 (listing persons disqualified from practicing law); 10A O.S.Supp.2017 § 1-1-105(21) (listing those that qualify as a "deprived child"); 12 O.S.Supp.2017 § 95 (listing the limitation periods for various causes of action); 12 O.S.2011 § 134 (listing the various venues in which it is appropriate to sue a domestic corporation); 12 O.S.Supp.2017 § 2004(C) (listing methods to effectuate service in a civil proceeding); id. § 2023(B) (listing the kinds of cases appropriate for class-action treatment); 12 O.S.2011 § 2103 (listing the tribunals and decisions to which the rules of evidence apply); 20 O.S.Supp.2017 § 3.1 (listing the salaries for the various members of this Court); 21 O.S.Supp.2017 § 701.7(B) (listing all the offenses that qualify as first degree, "felony" murder); 31 O.S.2011 § 1 (listing all property exempt from attachment and forced sale); 51 O.S.Supp.2017 § 24A.3(2) (listing public bodies to which the Open Records Act applies); 63 O.S.Supp.2017 §§ 2-204, 2-206, 2-208, 2-210, 2-212 (listing the scheduled "controlled dangerous substances").

[39] IDEA2, § 15, 2017 O.S.L. at 1579-80 (to be codified at 47 O.S. § 756).

[40] Id. sec. 15, § 756(A), 2017 O.S.L. at 1579.

[41] Majority Op. ¶ 33.

[42] Id.

[43] IDEA2, sec. 15, § 756(A), (D), 2017 O.S.L. at 1579.

[44] See 47 O.S.2011 § 756(A) ("Upon the trial of any criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a motor vehicle while under the influence of alcohol or any other intoxicating substance . . . ."). Indeed this language dates back to the original version of section 756 enacted in 1967. See Act of April 19, 1967, ch. 86, § 6, 1967 O.S.L. 135, 136-37 ("Upon the trial of any criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a motor vehicle while under the influence of alcohol or intoxicating liquor . . . .").

[45] See Ethics Comm'n of State of Okla. v. Cullison, 1993 OK 37, ¶ 29, 850 P.2d 1069, 1079 ("[A]n invalidly enacted statute is a nullity. It is as inoperative as if it had never been passed. The natural effect of this rule . . . is that once the invalidly enacted statute has been declared a nullity, it leaves the law as it stood prior to the enactment." (citations omitted) (quoting State ex rel. Goodner v. Speed, 640 P.2d 13, 16 (Wash. 1982))).

[46] IDEA2, sec. 4, § 6-204(C), 2017 O.S.L. at 1562 (to be codified at 47 O.S. § 6-204).

[47] Majority Op. ¶ 34.

[48] 47 O.S.Supp.2017 § 6-205(A)(2).

[49] 47 O.S.2011 § 6-204.

[50] 47 O.S.Supp.2016 § 6-205(A)(1), (3)-(11) (requiring revocation for committing a felony while using a vehicle, failing to pay for gasoline pumped into a vehicle, failing to stop for a school bus loading or unloading children, etc.).

[51] IDEA2, §§ 5-6, 2017 O.S.L. at 1562-66.

[52] The bill passed the Senate by a vote of 33 to 9, and the House by a vote of 58 to 26. Senate Journal, 56th Leg., 1st Reg. Sess. 1203 (Okla. 2017); House Journal, 56th Leg., 1st Reg. Sess. 1350 (Okla. 2017).

[53] Brooks v. State, 1931 OK 580, ¶ 17, 3 P.2d 814, 816.

[54] Majority Op. ¶ 2 ("We hold the [Act] is unconstitutional in its entirety due to violating the single subject rule in Okla. Const. Art. 5 § 57. We [also] hold one provision of the Act, section 13, violates the Due Process Clause in Okla. Const. Art. 2 § 7.").

[55] Id. ¶ 20.

[56] See Pet'rs' Appl. to Assume Original Jurisdiction ¶ 10, at 4 (identifying the due process question presented as "whether the Act's requirements of the taking and destroying of an individual's driver's license without due process of law" violates the Due Process Clause.); id. ¶ 25, at 8 ("[T]he Act requires DPS to destroy the license upon receipt. The Act also repeals all hearing requirements from the statute. Since there is no automatic revocation of the license under SB 643 there is no need to take an individual's property and certainly no reason to destroy it, both of which occur without the due process protections of notice and an opportunity to be heard."(citing Price v. Reed, 1986 OK 43, ¶ 11, 725 P.2d 1254, 1259-60 (a case without any substantive due process claim))); Pet'rs' Br.-in-Chief 10-11 (repeating the arguments in their Application and providing no authority in support of anything other than a procedural due process claim); Pet'rs' Reply Br. 14 (repeating their claim as one that SB 643 "provides for the seizure and destruction of property without due process"(emphasis added)); see also Exec. Resp'ts' Br. 12-13 (understanding the claim to be a procedural due process claim.); Legis. Resp'ts' Br. 8-11 (same).

[57] The Court's sole basis for insisting that a substantive due process claim was raised is a line in the Application stating that "there is no need to take an individual's property and certainly no reason to destroy it." Majority Op. ¶ 13. The Court lifts this line in the Application out of context, omitting the latter half of the sentence, which makes clear the DUI attorneys are complaining that the deprivation occurs "without the due process protections of notice and an opportunity to be heard," and which is followed by a citation to a case involving no substantive due process claim or discussion. See Pet'rs' Appl. to Assume Original Jurisdiction ¶ 25, at 8 (citing Price, 1986 OK 43, ¶ 11, 725 P.2d at 1259-60).

[58] Additionally, because "the adversary system is a cornerstone of our jurisprudence," the precedential value of a case "is diminished by the fact that the case was submitted without argument, or on scanty or insufficient argument." Bryan A. Garner et al., The Law of Judicial Precedent 226 (2016); see also McCutcheon v. Fed. Election Comm'n, 134 S. Ct. 1434, 1447 (2014) (plurality opinion) (dismissing Buckley v. Valeo, 424 U.S. 1 (1976), as lacking precedential weight on a certain issue because the opinion in the case was "written without the benefit of full briefing or argument on the issue"); Hohn v. United States, 524 U.S. 236, 251 (1998) (disregarding House v. Mayo, 324 U.S. 42 (1945) (per curium), for the same reasons).

[59] Majority Op. ¶ 20.

[60] LaFalier v. Lead-Impacted Comtys. Relocation Assistance Trust, 2010 OK 48, ¶ 15, 237 P.3d 181, 188.

[61] Jacobs Ranch, L.L.C. v. Smith, 2006 OK 34, ¶ 18, 148 P.3d 842, 848.

[62] Davis v. Fieker, 1997 OK 156 ¶ 35, 952 P.2d 505, 514 (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)).

[63] See, e.g., Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1976) ("[T]he burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way."); In re Okla. Dev. Fin. Auth., 2004 OK 26, ¶ 15, 89 P.3d 1075, 1080 ("[A] heavy burden is placed on those challenging a legislative enactment, and every presumption is to be indulged in favor of the constitutionality of a statute.").

[64] Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997) ("Our established method of substantive-due-process analysis has two primary features: First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. Second, we have required in substantive-due-process cases a careful description of the asserted fundamental liberty interest. Our Nation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decisionmaking, that direct and restrain our exposition of the Due Process Clause." (internal quotation marks & citations omitted)).

[65] See, e.g., Lawrence v. Texas, 539 U.S. 558, 567 (2003) (invalidating a Texas law without specifically defining the fundamental right implicated); see also id. at 586 (Scalia, J., dissenting).

[66] 47 O.S.Supp.2016 § 6-209(D).

[67] See Majority Op. ¶ 15 & n.20 (citing Price v. Reed, 1986 OK 43, ¶ 11, 725 P.2d 1254, 1260 (holding that due process was required prior to revocation of driving privileges)).

[68] At oral argument, counsel for Petitioners agreed that under the new law the arrestee is "going to be given a piece of paper that is 45 days with no driving privilege lost, at all. . . . They face no ramifications [to] their driving license until they plead to the charge down the road in the criminal case." OA at 6:25. Under preexisting law, an impaired driver's plastic license was seized and his driving privilege was automatically revoked after arrest unless he timely requested an administrative hearing. See 47 O.S.Supp.2016 §§ 6-205.1, 753; 47 O.S.2011 § 754. SB 643 thus changes the law in a manner that is favorable to arrestees because it allows the arrestee to retain his driving privilege pending resolution of his criminal case.

[69] Price, 1986 OK 43, ¶¶ 11, 15, 725 P.2d at 1259-61 (citing Robertson v. State ex rel. Lester, 1972 OK 126, ¶ 9, 501 P.2d 1099, 1101 (holding that "[a] driver's license is not a contract or a property right in the constitutional sense, and therefore its revocation does not constitute the taking of property")). While the Price Court disagreed with the Robertson Court's conclusion that no property right exists in the driving privilege, the Price Court ultimately rejected the due process challenge to the statute, holding that no violation of "the fundamental law's due process safeguards" had been identified. Id. ¶ 15, 725 P.2d at 1261. If Price had, as the Court claims, found a protected property right in the plastic license card, as opposed to the driving privilege, that conclusion makes no sense, given that no process was afforded to the seizure of the plastic license.

[70] See Nichols v. State ex rel. Dep't of Pub. Safety, 2017 OK 20, ¶ 29, 392 P.3d 692, 698 (holding that "if the driver requests a hearing, the proceeding should be held within sixty (60) days of the Department's receipt of notice").

[71] Gladstone v. Bartlesville Indep. Sch. Dist. No. 30 (I-30), 2003 OK 30, ¶ 12, 66 P.3d 442, 448 (noting that a law will survive rational-basis scrutiny "so long as 'there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" (quoting F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993))); U.S. R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 179 (1980) ("Where . . . there are plausible reasons for Congress' action, our inquiry is at an end.").

[72] Lawrence v. Texas, 539 U.S. 558 (2003).

[73] Gladstone, 2003 OK 30, ¶ 12, 66 P.3d at 448.

[74] See Majority Op. ¶ 20; Torres v. Seaboard Foods, LLC, 2016 OK 20, ¶¶ 47-48, 373 P.3d 1057, 1079 (holding that no rational basis existed for a workers' compensation law requiring that employees be employed with their current employer for a continuous 180-day period before being able to file a claim for cumulative trauma).

[75] Fent v. Okla. Capital Improvement Auth., 1999 OK 64, ¶ 4, 984 P.2d 200, 204.

 

 

 

 

 

 

 

 

 





 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 1986 OK 43, 725 P.2d 1254, 57 OBJ 1704, Price v. Reed
Discussed at Length
 1990 OK 58, 807 P.2d 774, 61 OBJ 1765, Forest Oil Corp. v. Corporation Com'n of Oklahoma
Discussed
 1991 OK 107, 819 P.2d 694, 62 OBJ 3397, Johnson v. Walters
Discussed
 1992 OK 122, 838 P.2d 1, 63 OBJ 2386, Initiative Petition No. 349, State Question No. 642, In re
Discussed
 1993 OK 37, 850 P.2d 1069, 64 OBJ 978, Ethics Com'n of State of Okl. v. Cullison
Discussed at Length
 1993 OK 162, 865 P.2d 1232, 65 OBJ 33, Hendrick v. Walters
Discussed
 1994 OK 127, 885 P.2d 1358, 65 OBJ 3835, Chronic Pain Associates, Inc. v. Bubenik
Discussed
 1994 OK 148, 890 P.2d 906, 65 OBJ 4214, Toxic Waste Impact Group, Inc. v. Leavitt
Discussed at Length
 1994 OK 142, 897 P.2d 1116, 65 OBJ 4181, Southwestern Bell Telephone Co. v. Oklahoma Corp. Com'n
Discussed
 1917 OK 229, 165 P. 419, 63 Okla. 285, STATE ex rel. FREELING v. LYON
Discussed
 1908 OK 207, 98 P. 557, 22 Okla. 435, In re COUNTY COM'RS OF COUNTIES COMPRISING SEVENTH JUDICIAL DIST.
Discussed
 1964 OK 74, 391 P.2d 242, GORDON v. FOLLOWELL
Discussed at Length
 1931 OK 580, 3 P.2d 814, 152 Okla. 119, BROOKS et al. v. STATE et al.
Discussed at Length
 2002 OK 71, 55 P.3d 1072, OKLAHOMA PUBLIC EMPLOYEES ASSOCIATION v. OKLAHOMA DEPT. OF CENTRAL SERVICES
Discussed
 1972 OK 126, 501 P.2d 1099, ROBERTSON v. STATE EX REL. LESTER
Discussed
 2003 OK 30, 66 P.3d 442, GLADSTONE v. BARTLESVILLE INDEPENDENT SCHOOL DISTRICT NO. 30
Discussed at Length
 2004 OK 26, 89 P.3d 1075, IN THE MATTER OF THE APPLIC. OF THE OKLA. DEVELOPMENT FINANCE AUTHORITY
Discussed
 2005 OK 86, 126 P.3d 588, BARZELLONE v. PRESLEY
Discussed
 2006 OK 34, 148 P.3d 842, JACOBS RANCH, L.L.C. v. SMITH
Discussed
 2007 OK 27, 163 P.3d 512, FENT v. CONTINGENCY REVIEW BOARD
Discussed at Length
 2007 OK 30, 158 P.3d 1058, OKLAHOMA EDUCATION ASSOCIATION v. STATE ex rel. OKLAHOMA LEGISLATURE
Discussed
 2007 OK 78, 171 P.3d 899, ARKANSAS VALLEY STATE BANK v. PHILLIPS
Discussed
 2008 OK 81, 195 P.3d 372, KNIGHT v. MILLER
Discussed at Length
 2009 OK 15, 214 P.3d 799, FENT v. STATE ex rel. OKLAHOMA CAPITOL IMPROVEMENT AUTHORITY
Discussed
 2010 OK 21, 233 P.3d 380, NOVA HEALTH SYSTEMS v. EDMONDSON
Discussed
 2010 OK 48, 237 P.3d 181, LAFALIER v. THE LEAD-IMPACTED COMMUNITIES RELOCATION ASSISTANCE TRUST
Discussed
 2011 OK 53, 260 P.3d 1251, THOMAS v. HENRY
Discussed at Length
 2011 OK 57, 270 P.3d 113, TULSA INDUSTRIAL AUTHORITY v. CITY OF TULSA
Discussed
 2011 OK 84, 264 P.3d 1197, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MOTHERSHED
Discussed
 2012 OK 53, 280 P.3d 959, OKLAHOMA CORRECTIONS PROFESSIONAL ASSOC. INC. v. JACKSON
Discussed
 2013 OK 14, 297 P.3d 378, STATE ex rel. BOARD OF REGENTS OF THE UNIVERSITY OF OKLAHOMA v. LUCAS
Discussed
 2013 OK 37, 302 P.3d 789, DOUGLAS v. COX RETIREMENT PROPERTIES, INC.
Discussed at Length
 2013 OK 107, 315 P.3d 1023, FENT v. FALLIN
Discussed at Length
 2014 OK 8, 319 P.3d 674, GENTGES v. OKLAHOMA STATE ELECTION BOARD
Discussed at Length
 2014 OK 23, 326 P.3d 496, IN RE: INITIATIVE PETITION NO. 397, STATE QUESTION NO. 767
Discussed
 2014 OK 56, 335 P.3d 779, IN THE MATTER OF THE GUARDIANSHIP OF BERRY
Discussed
 2016 OK 20, 373 P.3d 1057, TORRES v. SEABOARD FOODS, LLC
Discussed at Length
 1980 OK 96, 614 P.2d 45, State ex rel. Howard v. Oklahoma Corp. Commission
Discussed at Length
 2016 OK 121, 387 P.3d 348, BURNS v. CLINE
Discussed
 2017 OK 20, 392 P.3d 692, NICHOLS v. STATE ex. rel. DEPT. OF PUBLIC SAFETY
Discussed at Length
 2017 OK 34, 394 P.3d 1224, OSAGE NATION v. BD. OF COMMISSIONERS OF OSAGE COUNTY and OSAGE NATION v. OSAGE COUNTY BD. OF ADJUSTMENT
Discussed
 2017 OK 84, HUNSUCKER v. FALLIN
Cited
 2017 OK 85, RICHARDSON v. STATE ex rel. OKLAHOMA TAX COMMISSION
Discussed
 1978 OK 158, 614 P.2d 551, STATE EX REL. WISEMAN v. OKL. BD. OF CORRECTIONS
Discussed
 1980 OK 174, 625 P.2d 595, Initiative Petition No. 314, In re
Discussed
 2000 OK 40, 5 P.3d 1088, 71 OBJ 1291, Dank v. Benson
Discussed at Length
 1997 OK 127, 948 P.2d 279, 68 OBJ 3316, Brock v. Thompson
Discussed at Length
 1997 OK 156, 952 P.2d 505, 69 OBJ 34, DAVIS v. FIEKER
Discussed
 1948 OK 76, 191 P.2d 938, 200 Okla. 70, BOND v. PHELPS
Discussed
 1998 OK 36, 958 P.2d 1250, 69 OBJ 1672, ETHICS COMMISSION v. KEATING
Discussed
 1999 OK 16, 976 P.2d 545, 70 OBJ 778, Cities Service Co. v. Gulf Oil Corp.
Discussed
 1999 OK 64, 984 P.2d 200, 70 OBJ 2100, Fent v. Oklahoma Capitol Improvement Authority
Discussed
Title 5. Attorneys and the State Bar
 Cite
Name
Level

 5 O.S. 1, Persons Who May Not Practice as an Attorney - Aliens
Cited
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 95, Limitation of Other Actions
Cited
 12 O.S. 134, Domestic Corporations
Cited
 12 O.S. 2004, 12 O.S. 2004, Process
Cited
 12 O.S. 2103, Scope of Rules
Cited
Title 20. Courts
 Cite
Name
Level

 20 O.S. 3.1, Salaries
Cited
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 701.7, Murder in the First Degree
Cited
Title 31. Homestead and Exemptions
 Cite
Name
Level

 31 O.S. 1, Property Exempt from Attachment, Execution or Other Forced Sale - Bankruptcy Proceedings
Cited
Title 47. Motor Vehicles
 Cite
Name
Level

 47 O.S. 6-205, Mandatory Revocation of License by Department
Discussed at Length
 47 O.S. 754, Surrender or Seizure of License - Receipt as Temporary License - Revocation or Denial of Driving Privilege - Procedure to Release Controlled Substances for Analysis
Discussed at Length
 47 O.S. 6-303, Driving While License Under Suspension or Revocation - Penalties - Motorcycles
Cited
 47 O.S. 754.1, Modification of Revocation or Denial in Cases of Extreme and Unusual Hardship - Ignition Interlock Device
Cited
 47 O.S. 755, Repealed
Cited
 47 O.S. 6-212, Conditions for Reinstatement
Cited
 47 O.S. 2-116, Giving of Notice
Cited
 47 O.S. 6-204, Order by Court to Surrender License to Department - Report of Conviction
Discussed at Length
 47 O.S. 6-209, Surrender and Return of License - Seizure of License
Cited
 47 O.S. 753, Refusal to Submit to Test - Revocation of License - Reinstatement of License - Penalties
Cited
 47 O.S. 756, Admission of Evidence Shown by Tests
Discussed at Length
Title 51. Officers
 Cite
Name
Level

 51 O.S. 24A.3, Definitions
Cited
Title 63. Public Health and Safety
 Cite
Name
Level

 63 O.S. 2-204, Schedule I
Cited
Title 75. Statutes and Reports
 Cite
Name
Level

 75 O.S. 11a, Observance of Rules in Construction of Statutes
Cited

 1982 WA 18, 640 P.2d 13, 96 Wash.2d 838, State ex rel. Goodner v. Speed
Cited